[Civ. No. 12872. First Dist., Div. Two. Sept. 25, 1945.]

J. LA MALFA et al., Appellants, v. PIOMBO BROS. (a Copartnership) et al., Respondents.

James F. Boccardo and Edwin H. Williams for Appellants.

Henry F. Wrigley and John J. Taheny for Respondents.

DOOLING, J. pro tem.—Plaintiffs appeal from a judgment for defendants entered upon a directed verdict. Defendant, Piombo Bros., is a copartnership engaged in the contracting business and at the time of the occurrence out of which this action arises had a contract to enlarge the San Francisco Airport in San Mateo County. This work required the hauling of material to make a fill and, in addition to using several of their own trucks to haul this material, Piombo Bros. engaged the services of trucks owned by other persons. It is undisputed that in the case of the trucks owned by others than Piombo Bros., with the exception of the truck belonging to plaintiffs which is the subject of this action, the trucks were hired by Piombo Bros. with drivers furnished by the truck owners. It may be taken as established that the drivers of all such trucks were employees of the respective owners of the trucks and not of Piombo Bros. and that the owners of such trucks were subcontractors of Piombo Bros.

Among these subcontractors was a man named Morgan who was furnishing two trucks with drivers to Piombo Bros. Morgan, knowing that plaintiffs were the owners of an International truck, suggested to one Adams, a foreman for Piombo Bros., that if he was interested it might be possible to secure plaintiff's International truck for use on the job. Adams

stated that if Morgan could secure the truck he would be glad to have it. Morgan went to Morgan Hill and saw the plaintiff La Malfa. According to La Malfa's testimony Morgan stated to him that he could rent the truck to Piombo Bros. for use on the airport job and that Piombo Bros. would furnish the drivers and pay their wages. In this connection La Malfa testified positively as to his conversation with Morgan:

"We said we didn't want to hire any drivers, we didn't want to have any drivers on the payroll; we would just rent the bare truck."

Morgan was called as a witness for defendants but his attention was not called to this testimony of La Malfa and it stands without conflict in the record.

Adams testified, however, that when Morgan brought the plaintiffs' truck to the job his agreement with Morgan was to hire the truck with a driver employed by the owners. It is clear from the testimony that the drivers of the plaintiffs' International truck were actually engaged by Morgan while he remained on the job and by one Grove after Morgan left. The wages of all drivers, including the drivers of plaintiffs' truck, were actually paid by Piombo Bros. and their wages charged back to the owners of the trucks. Piombo Bros. carried the workmen's compensation insurance on all truck drivers, their names and accounts were entered on Piombo Bros.' books and they were reported to the insurance carrier as Piombo Bros.' employees.

By agreement with plaintiff, La Malfa, Morgan was to service the International truck while it was in use by Piombo Bros. and was to receive therefor ten per cent of the income from the truck. Shortly before the collision which gave rise to this action occurred Morgan sold his own trucks to Grove and left. He turned plaintiffs' truck over to Grove and asked him to keep it serviced and working on the job. Plaintiffs testified that they had never heard of Grove and did not know that he was servicing their truck until after the truck was damaged. Grove engaged one Scovil to drive plaintiffs' truck and while Scovil was hauling material on a private roadway built by defendant Piombo Bros. for use in performing their contract the truck came into collision with a truck owned by Diamantine Bros. and plaintiffs brought this action against Piombo Bros. for the damage to their truck sustained in this collision.

Before detailing the evidence of the circumstances surrounding the collision clarity will be served by first considering the legal relation of the plaintiffs and defendant partnership arising from the arrangement for the use of the truck made through the intermediacy of Morgan.

We may first notice that we are bound by the rule recently restated by the Supreme Court in *Wood* v. *Samaritan Institution,* 26 Cal.2d 847, 849 [161 P.2d 556].

"According to established principles it is our duty, in determining an appeal from a judgment entered on a directed verdict, to consider only the evidence most favorable to plaintiff, together with every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise therefrom in support of plaintiff."

It is clear that Morgan's authority as agent for plaintiffs was exceeded when he undertook to hire drivers for their truck and to contract with defendants' foreman to furnish the truck to Piombo Bros. with a driver. We may note, in passing, that under plaintiffs' testimony, if believed, Grove had no authority whatever from plaintiffs and was not their agent for any purpose.

The court said in *Ernst* v. *Searle,* 218 Cal. 233, 240 [22 P.2d 715]:

"A third person, such as appellant, is not compelled to deal with an agent, but if he does so, he must take the risk. He takes the risk not only of ascertaining whether the person with whom he is dealing is the agent, but also of ascertaining the scope of his powers. The rule is cogently stated in 1 Mechem on Agency, second edition, section 743, page 527, as follows: 'An assumption of authority to act as agent for another of itself challenges inquiry. Like a railroad crossing, it should be in itself a sign of danger and suggest the duty to "stop, look and listen." It is therefore declared to be a fundamental rule, never to be lost sight of and not easily to be overestimated, that persons dealing with an assumed agent whether the assumed agency be a general or special one, are bound at their peril, if they would hold the principal, to ascertain not only the fact of the agency but the nature and extent of the authority, and in case either is controverted, the burden of proof is upon them to establish it.' "

Adams, as agent for defendant partnership, in negotiating with Morgan for the use of plaintiffs' truck knew that

the truck belonged to plaintiffs and not to Morgan. The duty was cast upon Adams to ascertain the scope and extent of Morgan's authority from plaintiffs to contract for the use of the truck. That inquiry if made would have disclosed that the limit of that authority was to rent the "bare truck" to Piombo Bros. and that Morgan had no authority to hire drivers for the truck or to contract with Piombo Bros. to furnish them the services of the truck with driver.

Even if hired by Morgan, Scovil, who was driving the truck at the time of the collision, would not have been the employee of plaintiffs. That Scovil was in fact hired by Grove who, under plaintiffs' testimony, had no authority of any sort from them, only serves to make clearer the fact that Scovil was not the plaintiffs' employee.

The case is the not uncommon one of a purported contract with an agent in excess of the agent's authority by which the plaintiffs, as Morgan's principals, were not bound. This resulted in the anomalous situation of plaintiffs' truck being in use in defendants' work, wrongfully as to plaintiffs, but with defendants' full and complete acquiescence and consent.

The diligence of counsel has not produced a case dealing with the duty of care for the safety of the truck cast upon defendants under such circumstances. We are compelled, therefore, to arrive at the solution of this question by reasoning from analogies.

A possessor of property is bound to exercise ordinary care for the safety of an invitee upon the property in his possession and under his control. (19 Cal.Jur. 618.) This duty extends to the property of the invitee as well as to his person. (*Royal Ins. Co.* v. *Mazzei*, 50 Cal.App.2d 549 [123 P.2d 586].) The servant of an independent contractor engaged in performing services on the land for its possessor occupies the status of an invitee. (*Hinds* v. *Wheadon*, 19 Cal.2d 458, 460 [121 P.2d 724]; *Leenders* v. *California Hawaiian etc. Corp.*, 59 Cal.App.2d 752, 756 [139 P.2d 987].)

In the anomalous situation of the plaintiffs' truck engaged in the performance of services for defendants, wrongfully as to plaintiffs because operating under a purported contract with their agent attempted to be made in excess of his authority, it would seem that the defendants would owe the same duty of ordinary care for the safety of the truck that they would owe to an invitee for the safety of his person and

property. The truck, an inanimate object it is true, was on defendants' private roadway at defendants' invitation and on defendants' business. It was there in the control of a driver who was a business invitee of defendants. ██ That this driver had no authority from plaintiffs to operate the truck was a fact which defendants were under a duty to ascertain at the time that they entered into the contract with Morgan under the rule above quoted from *Ernst* v. *Searle, supra.* ██ We entertain no doubt that under the circumstances the defendants were under a legal duty to exercise ordinary care for the safety of the plaintiffs' truck.

██ The evidence showed that in preparation for the performance of their contract defendants had built certain private roadways for use by the trucks which would later be engaged in hauling material to the fill. One of these roadways paralleled the Bayshore Highway and by reason of topographical difficulties was too narrow to accommodate two-way traffic by trucks throughout its length. It was for this reason designed to be used as a one-way road. It made a turn into another private roadway which connected at approximately right angles with the Bayshore Highway and was designed for two-way traffic. The plan of operation contemplated by defendants for the use of these roadways called for loaded trucks to proceed along the two-way private roadway to the turn into the one-way private roadway, follow the turn into the one-way road and proceed thereon to the fill; and for the empty trucks to return on the Bayshore Highway to the point where it was intersected by the two-way private roadway, turn onto the two-way road and proceed thereon to the shovels where the filling material was loaded onto the trucks. The evidence shows, however, that disregarding the requests of defendants' agents on the job to all contracting truckmen to follow this procedure many of them, including Diamantine Bros., directed their drivers to keep their trucks off the Bayshore Highway at all times and to travel both ways on the one-way private road. It also appears that when a loaded truck traveling on the two-way private road approached the turn into the one-way road at the same time that an unloaded truck was pulling into the two-way road from the highway, it was the practice of many of the drivers of loaded trucks to pull to the left to permit the unloaded trucks the more readily to pass them; while the drivers of other trucks kept their trucks on the right hand side at all times. There was also

evidence from which the jury could have found that the safer practice at this turn was for a loaded truck to pull to the left when an empty truck was approaching it from the Bayshore Highway. The driver of plaintiffs' truck testified that at a time when he was employed by defendants to drive one of their trucks he had been instructed by defendants' foreman to pull his truck to the left under such circumstances. This the foreman denied, but there is ample evidence that defendants through their agents in charge of the work, knew that some drivers were pulling to the left and others keeping to the right at this turn, and that they also were fully advised that some empty trucks were being driven over the one-way road contrary to the method of operation for which the one-way road was designed and in violation of the direction to all truck operators that they drive empty trucks on the Bayshore Highway and not on the one-way road.

That these diverse and conflicting modes of operation created confusion and greatly increased the hazard of collision between trucks proceeding in opposite directions might be readily inferred by the jury. Indeed the witness Diamantine, called by the defendants, testified:

"I knew that a condition existed there to this extent—not all the drivers of all the different contractors that was on the job were going on the left hand side of the road, and some were maintaining their right—some were going to the left, and a person being there never knew what the truck was going to do. In other words, some of our drivers were maintaining the right hand side for four or five or six trips, then possibly he would meet an oncoming truck, and he would have to swerve over to the left, due to the fact that this other truck was also on the left. There was a congestion there that was not any too pleasant."

The collision with plaintiffs' truck which gives rise to this action occurred at night. Scovil, the driver of plaintiffs' truck, testified that he was driving the truck loaded along the two-way road approaching the curve into the one-way road, that he saw the lights of a truck approaching and believed that it was on the Bayshore Highway; that he pulled to the left on the turn, following his custom, to permit the approaching truck to pass him; that the other truck was in fact traveling on the one-way road and the two collided on the turn. The other truck belonged to Diamantine Bros. and was oper-

ated by a driver who had come onto the job for the first time that night.

Respondents to sustain the directed verdict rely upon the cases which hold that a person is not liable for the negligence of an independent contractor with whom he has entered into a contract. (*Boswell* v. *Laird*, 8 Cal. 469 [68 Am.Dec. 345]; *Teller* v. *Bay & River Dredging Co.*, 151 Cal. 209 [90 P. 942, 12 Ann.Cas. 779, 12 L.R.A.N.S. 267]; *Atlanta & F. R. Co.* v. *Kimberly*, 87 Ga. 161 [13 S.E. 277, 27 Am.St.Rep. 231].) The general principle may be readily conceded. This concession however does not dispose of the case, if the jury could properly find under the evidence that defendants were in possession and control of the private roads and negligently permitted operations to be continued thereon as a result of which a person of ordinary prudence could foresee that a collision such as actually occurred was likely to ensue. The general principle involved is thus stated in Restatement of Torts, section 449:

"If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby."

This rule has been applied by our own courts to a variety of factual situations. (*Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213 [157 P.2d 372]; *Katz* v. *Helbing*, 215 Cal. 449 [10 P.2d 1001]; *Pastene* v. *Adams*, 49 Cal. 87; *Terrell* v. *Key System*, 69 Cal.App.2d 682 [159 P.2d 704]; *Stockwell* v. *Board of Trustees*, 64 Cal.App.2d 197 [148 P.2d 405]; *Siebel* v. *Shapiro*, 58 Cal.App.2d 509 [137 P.2d 56].)

More specifically as applied to the relation of contractor and contractee we quote from Restatement of Torts, section 414 and Comments *a* and *b* thereto:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

"*a*, . . . The employer may . . . retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done or to forbid its being done in a manner likely to be dangerous to himself or others. Such a super-

visory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

"*b*. The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done and has the opportunity to prevent it by exercising the power of control which he has retained in himself."

The jury could well have found from the evidence in this case that defendants, as general contractors, had built these private roadways for use in the performance of the contract; that they remained in general possession and control of them under the principal contract for that purpose; that their foremen were at all times present in general supervision of the work; that these foremen knew that the subcontractors were customarily operating their trucks over these private roadways in a manner likely to produce collisions between trucks; and that defendants failed to exercise their general control over the private roadways to direct the traffic in such fashion as to prevent such dangerous practices.

Defendants argue that there is no showing in the record that they were in fact in possession and control of the private roadways. They built the roadways for the performance of their general contract; they with their own trucks driven by their own employees used them for that purpose; they likewise permitted the subcontracting truck owners to use them for the same purpose. The jury could have reasonably inferred that under their general contract they had the right to their possession, use and control. They also argue that, while they "requested" all truck owners to use the Bayshore Highway, and not the one-way road, for their trucks when returning empty, some truck owners, including Diamantine Bros., refused to comply with their request. The record would support the inference that they permitted this state of anarchy

not because they had not retained the general control of the private roadways but because they preferred to take the risk involved to keep the trucks on the job. The defendants' general superintendent testified that the job was a rush job and that "in these days we are subject to lots of whims of individuals."

We attach no importance in support of the directed verdict to the fact that after the collision plaintiffs accepted a check from defendants in full payment for the use of their truck, attached to which was a statement setting out the drivers' wages paid by defendants and deducting·them from the gross rental of the truck with drivers to arrive at the net payment. Plaintiffs testified that they were not concerned with defendants' method of bookkeeping so long as they received the amount to which they were entitled, and the jury could have found that they were not put on notice by the form of the statement that defendants were claiming that they had hired the truck with drivers employed by the plaintiffs.

The claim that plaintiffs are barred from recovery by the negligence of the driver of their truck is completely met by the fact that the jury could have found that Scovil was not negligent. It is only where there is no room for reasonable minds to differ and the conclusion that he was guilty of negligence is the only one that can be rationally drawn from the evidence that a person can be held guilty of negligence as a matter of law. (*Kirk* v. *Los Angeles Ry. Corp.*, 26 Cal. 2d 833, 838 [161 P.2d 673]; *Anthony* v. *Hobbie*, 25 Cal.2d 814, 818 [155 P.2d 826].)

It is met, as well, by the fact already noted that under the uncontradicted evidence Scovil was not plaintiffs' employee. It is claimed that under section 402, Vehicle Code, Scovil was at least driving plaintiffs' truck with the express or implied consent of plaintiffs. (*Hicks* v. *Reis*, 21 Cal.2d 654 [134 P.2d 788].) We cannot agree. Morgan was entrusted with the truck by plaintiffs with limited authority. Even Morgan was without authority to hire drivers for the truck. Morgan in turn entrusted the truck to Grove who was a complete stranger to plaintiffs. Grove himself testified concerning his employment of Scovil:

"Q. You said something about you would have the privilege of putting another driver on there? A. Well, no sir, I took it on my own authority, maybe. It is better to have the truck operating than sitting still. Anyone with common sense would

know that; but nobody gave me any direct authority. I took it on my own, because that was my job, to keep it operating.''

We are satisfied that the court erred in directing the verdict for defendants. The judgment is reversed.

Nourse, P. J., and Goodell, J., concurred.

A petition for a rehearing was denied October 25, 1945, and respondents' petition for a hearing by the Supreme Court was denied November 19, 1945.