[Civ. No. 18750.  Second Dist., Div. Two.  July 18, 1952.]

DAN E. HARD, Respondent, v. HOLLYWOOD TURF CLUB (a Corporation) et al., Defendants; L. E. DIXON COMPANY, INC. (a Corporation), Appellant.

Schell, Delamer & Loring for Appellant.

Samuel P. Young for Respondent.

MOORE, P. J.—The Hollywood Turf Club by a writing engaged appellant to remodel and renovate its grandstand by removing two floors of a section and by reconstructing three floors. For the purpose of executing its contract, appellant let 21 subcontracts with the approval of the club and employed 125 men for the general work. The Arenz-Warren Company had the subcontract to do the painting and it·employed a superintendent and two foremen besides workmen. Respondent was one of the painters. On December 15, 1947, he was at work on a defective scaffold when it collapsed and precipitated him 40 feet causing severe injuries. As his employer, Arenz-Warren submitted to the jurisdiction of the

Industrial Accident Commission which awarded respondent compensation for his injuries. By this action respondent has been awarded judgment for damages against the general contractor based upon the latter's alleged negligence.

Respondent claims that he had two employers at the grandstand, namely, Arenz-Warren who engaged him to work and the L. E. Dixon Company which did not employ him to work. As to the former there is no dispute. They have answered for the industrial accident in the proper form. They constructed their scaffold and their employee was injured by using it. But respondent contends that he is entitled to a second judgment against appellant on the theory that the latter was also his employer; that its superintendent, Mr. Ayers, was "responsible for the job as a whole," scheduled and coordinated the work of the subcontractors, had to "push" the painters and other subcontractors to speed up their work, knew for two weeks of the high painting being done on the scaffolding. He saw that the painters were not equipped with such safety belts as he would have required his own men to wear. However, there is no evidence that appellant directly controlled the movements of respondent or of any employee of a subcontractor. Neither did appellant direct the details of the painting. It gave only general instructions as to the work to be done. But at the same time, Mr. Ayers knew that Arenz-Warren kept on the grandstand its own superintendent and two foremen, Messrs. Sheldon and Malone who supervised the rigging of scaffolds and directed the course of the painters' work.

Appellant had nothing to do with the construction of the scaffold. Its nearest approach thereto was transporting some of the materials to the overhead site by use of its crane. Included among such materials was a steel strip taken from an old section of the grandstand and used as support for one end of the scaffold. It was the buckling of this piece of metal which apparently caused the collapse of the scaffold from which respondent fell. There is no proof of the latter's assertion that the strip was actually supplied by appellant. In such event, any theory of direct or affirmative negligence on appellant's part is without evidential support. It supervised the reconstruction operations and accommodated Arenz-Warren by hoisting their materials to the higher levels. It follows that in the absence of proof of appellant's negligence, the only proposed theory upon which it can be adjudged the debtor of respondent is that

it was respondent's "employer," as that term is defined in the Labor Code discussed below. ■ It could not have been respondent's employer in the traditional sense of that term. "A subcontractor bears the same relation to the contractor that the latter does to his employer and the rule governing each status is the same." (*George* v. *Trinity Church,* 176 Cal. 553, 556 [169 P. 69].) Therefore, respondent as employee of a subcontractor is in no position to enforce a right to judgment against appellant. (*Slyter* v. *Clinton Const. Co.,* 107 Cal.App. 348, 353 [290 P. 643].)

While the trial judge recognized the general rule governing the liability of a general contractor, under instructions given, the jury was encouraged to find facts from which appellant's liability was the logical sequitur. It was successfully maintained below that (1) appellant was under statutory duty to provide a safe place for respondent to work and, (2) pursuant to the contract with the turf club, appellant had undertaken to provide for the safety of all workmen engaged in the reconstruction operations.

### Safe Place to Work

Respondent was entitled to a safe place to work and to such devices as would reasonably have guarded him against injury. The state and the world of industry had reached that conclusion when in 1911 the Legislature was directed by section 21 of article XX of the Constitution to create the first "Workmen's Compensation Insurance and Safety Act." While the lawmakers are at liberty to enact bold and revolutionary measures in the exercise of the police power, the statesmen of that period sought to forestall contentions based upon archaic doctrines and contradictory statutes and to extend the judicial power to the Industrial Accident Commission authorized by section 21. The preservation of manpower, its security against loss or impairment and poverty were undertaken amid dire misgivings. How well it has succeeded is recorded nowhere with deeper-cut letters than in the archives of this state. All industries and commercial houses at first and, finally, all places where men and women toil, must guarantee the laborer against injury by any kind of accident, whatever its origin, so long as he is occupied in the course of employment at the time of injury. Measures for insuring the collectibility of such awards as might be made were also incorporated in statutes and the system works well.

But in the case at bar, the trial court instructed the jury that appellant, a general contractor, was under statutory duty to provide a safe place for respondent, employee of an independent subcontractor, to work and in particular to supply safe scaffolding in conformance with statutory regulations. The statutes involved are sections 6401, 7151 and 7152 of the Labor Code.[1] They relate to the duty of an employer to provide for the safety of his employees. Section 6401 requires every employer to furnish and use safety devices and to use practices and processes reasonably adequate to render the employment safe. Section 7151 requires all scaffolding suspended from an overhead support more that 10 feet above a solid surface to be equipped with a rigid safety rail and so secured as to prevent swaying and to have sufficient strength to support any weight which might reasonably be placed thereon. Section 7152 requires safety lines to be furnished to tie the hooks on the roof, and a line secured above to the individual workman.

While the three sections clearly impose upon the employer definite responsibilities toward his employee, diffi-

---

[1]Section 6401: Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes, which are reasonably adequate to render such employment and place of employment safe. Every employer shall do every other thing reasonably necessary to protect the life and safety of employees.

Section 7151: If the working platform of any scaffolding swung or suspended from an overhead support is more than 10 feet above the ground, floor or area to which an employee on the scaffolding might fall, it shall have a safety rail of wood or other equally rigid material of adequate strength. Such rail shall be in compliance with the applicable orders of the Division of Industrial Safety.

Suspended scaffolding shall be fastened so as to prevent the same from swaying from the building, or structure, or other object being worked on from such scaffolding. All parts of such scaffolding shall be of sufficient strength to support, bear, or withstand with safety any weight of persons, tools, appliances, or materials which might reasonably be placed on it or which are to be supported by it. [In effect Sept. 19, 1947.]

Section 7152: In addition to the duties imposed by any law regulating or relating to scaffolding, an employer who uses or permits the use of scaffolding described in Section 7151 in connection with construction, alteration, repairing, painting, cleaning or doing of any work upon any building or structure, shall:

(a) Furnish safety lines to tie all hooks and hangers back on the roof of such building or structure.

(b) Provide safety lines hanging from the roof, securely tied thereto, for all swinging scaffolds which rely upon stirrups of the single point suspension type to support the working platform. One such line shall be provided for each workman with a minimum of one line between each pair of hangers or falls. [In effect Sept. 19, 1947.]

culties have risen by virtue of the emplacement of section 6304[2] in the definition chapter of part 1, division 5 of the Labor Code. That section declares that ''employer'' includes every person having direction, management, control or custody of any place of employment or employee. Because the comprehensive language of that section describes in general terms the work or office of the ''employer'' and because those terms describe the work of appellant in performing its contract with the turf club, respondent leaps to the conclusion that appellant was the employer of respondent and owed the latter the care prescribed by sections 6401, 7151 and 7152.

Such conclusion is erroneous. There is nothing contained in such statutes which indicates a legislative intent to apply the provisions of the scaffolding laws to a general contractor in his relations with a subcontractor's employee.

A scrutiny of the labor code and its statutory forebears leads only to the conclusion that sections 7151 and 7152 were intended to be applicable solely to an employer in the usual sense, to wit, one who has employed and managed the toiler. The definition of ''employer'' relied upon by respondent is found in section 6304, chapter 1, part 1, division 5 of the code, while sections 7151 and 7152 are under part 3—''Safety on Buildings''—with buildings under construction or repair heading article 1 and scaffolding being the subject of article 2. The language of section 7152 requires that an ''employer'' who uses scaffolding must furnish safety lines to tie all hooks and hangers back on the roof and also provide safety line hanging from the roof to support the platform and further to provide each workman with a line from the roof. Could it be said upon any reasonable construction that the intention there was to require the general contractor to provide such ''lines'' to an employee of a subcontractor who has undertaken to do the painting? Such a requirement would impose an unreasonable burden. Multiply that item by the number of employees on the premises serving 21 subcontractors and it would leave the office of a general contractor one to be avoided.

This leads to the observation that the aim of safety and insurance statutes is not to hinder or do harm to employers. Taking them by and large, those laws serve the best interest of management and of society as a whole by preserving the

---

[2] ''Employer'' shall have the same meaning as in section 3300 and shall also include every person having direction, management, control, or custody of any employment, place of employment, or any employee.

manpower of industry and by maintaining the established economy. The Legislature could not reasonably have intended to operate a hardship upon employers by making one contractor liable for the neglects of another. If as the generalissimo of a construction job, the general contractor leaves holes in the floor or grease upon it whereby any invitee might suffer injury, of course he would be liable. But where he has agreed by subcontract with an experienced and reputable painter to paint the ceilings and walls of the building under repair and the reputable painter negligently constructs an inferior scaffold that cannot support his workmen, it is nothing short of oppression to require the general contractor to pay the total amount of damages suffered by the injured workman as the result of the painter's negligence and thereby relieve the subcontractor of all charges he might have been obliged to pay on account of the accident.

Division 5 of the Labor Code has five parts. The definition of employer falls in the fifth section in part 1 and is preceded by section 6301 which reads: "As used in *this part* the terms described in the following sections shall have the meaning therein given them." If the Legislature had intended that the word "employer" shall have the meaning given in section 6304 in all other "Parts" of division 5, surely they would have said so. They could have said "Division" as easily as "Part." Such restriction upon the use of the terms employed in "Part 1" must have been intended. It cannot in all fairness be attributed to the indolence or indifference of the lawmakers. The foregoing observation is emphasized by the language of section 6300 which reads: "As used in *this division*:" commission, commissioner and insurer severally mean, etc. Thus, in two adjoining sections, the Legislature exercised the opportunity to demonstrate that in the 53 sections of Part 1 "employer" shall include "every person having control of a place of employment" whereas the terms defined in section 6300 shall have the same meaning throughout the entirety of division 5. Had it been the purpose of the Legislature to have "employer" mean the same thing throughout the "Division" it could have done so by substituting that word for "Part" in section 6301. Because it failed to make the substitution the conclusion is irresistible that it was a part of the general design that the term employer used in section 7152 has the

traditional meaning of employer, that is the one who has actually employed the plaintiff.

## OTHER INTRINSIC PROOF

The original Workmen's Compensation Act was enacted in 1911. (Stats. 1911, ch. 399, p. 796.) Section 4 thereof defined "employer" to be a person who has another in service under a contract of hire and who has elected to come under the act. While the provisions of that original statute were changed in some respects, in 1913 (Stats. 1913, ch. 176, p. 279) it retained virtually the same definition of "employer." But the amended act added section 51, page 305. It included a definition similar to the present section 6304 of the Labor Code. However, the language used emphasizes that the definitions laid down apply to sections 51 to 72 inclusive and to no others. Not one of those 22 sections contains a provision similar to the present scaffolding statutes. It thus appears from the original act and its first amendment that appellant could not have qualified as respondent's employer under the scaffolding act.

The Workmen's Compensation Act (herein called the act) remained unchanged insofar as the sections here involved are concerned until 1917. (Stats. 1917, ch. 786, p. 831.) Section 33 of the act as amended that year included the definition of "employer" as set forth in the 1913 edition of section 51, *supra*. Its meaning was again restricted to a certain portion of the act, to wit, sections 33 to 54 inclusive, which were substantially the same as sections 51 through 72 of the 1913 act. Sections 33 through 54 of the 1917 edition were subsequently codified as part 1, division 5 of the Labor Code, and no statute has ever been adopted to extend the definitions thereby included to apply to the scaffolding statute.

Included in part 3 of division 5 are sections 7151 and 7152 which had their origin in "an Act to regulate scaffolding" adopted in 1913 (Stats. 1913, ch. 48, §§ 1 and 2, pp. 49-50) on April 22—two months prior to the adoption of the amended Workmen's Compensation Act. The provisions of such scaffolding act were substantially the same as sections 7151 and 7152 of the present Labor Code. Neither in 1913 nor now did those sections contain a definition of "employer." But it is a fact not without significance that at the time of the first adoption of the scaffolding act in 1913, the word "employer" had not been so used as to include either an owner or a general contractor in his relation to a subcontractor. (*Carstens* v. *Pillsbury,* 172 Cal. 572,

580 [158 P. 218] ; *Sturdivant* v. *Pillsbury*, 172 Cal. 581, 582 [158 P. 222].) Inasmuch as the scaffolding act contains no indication that the term "employer" was to have other than its usual, orthodox meaning. it would approach judicial legislation for a court now to hold that it means the master of the premises or the general contractor who had nothing to do with the engagement of the workman who has served only the subcontractor. (*California Highway Com.* v. *Industrial Acc. Com.*, 200 Cal. 44, 48 [251 P. 808, 49 A.L.R. 1377].) The all-inclusive nature of the word had never been suggested prior to the amended Workmen's Act in September, 1913.

Respondent argues that parts 1 and 3 of division 5 both contain safety provisions, that by reason thereof they' are *in parimateria* and that consequently the same terms in each must be given the same meaning. Such reasoning is not persuasive. ██ The rule of *pari materia* is a rule of statutory construction that is invoked as an aid in determining the meaning of a statute whose purpose is not clear. But it has no application where the legislative intent is made unambiguous by the language employed by the lawmakers. (59 C.J. p. 1050, § 620.)

Moreover, the Legislature must have been moved by considerations of sound public policy in not expressly extending the meaning of "employer" as used in section 6304 to sections 7151 and 7152. The lawmakers must have reflected that to impose the duty upon the general contractor directly to oversee all labor being performed and to inspect every device imported for use by the workmen on a particular construction and to impose nondelegable duties upon him to enforce all statutory safety provisions would be to place an extremely onerous burden upon him who has the general control over the ultimate result of the labor done yet without control or management of the means utilized to achieve the purpose planned. To adjudge appellant liable for errors of judgment on the part of 21 separate subcontractors and to hold him responsible for the enforcement of the safety statutes would be tantamount to making it an insurer of every subcontractor's activities. For appellant efficiently and effectively to direct the operations of 21 subcontractors essential to the successful consummation of so stupendous a task as the contract with the turf club demanded would have required such an outlay in time, labor and expense as to frustrate computation. At the same time it is doubtful

that the undertaking of such manifold duties would have proved to be of greater safety or protection to the workers on the grandstand than they enjoyed under the provisions of the Workmen's Compensation and Insurance Act whereby every immediate employer is in duty bound to furnish his employees with all necessary, safe applicances and safe working area. Certainly such employer is in the best possible position more effectively to guard his own employee's welfare. Because the Legislature adopted this view it did not direct the scaffolding legislation to apply to an owner or general contractor. Adequate provision was made for the benefit of an injured worker to recover from his own employer before the Industrial Accident Commission which was granted judicial power. Because the act was adopted pursuant to the constitutional amendment (art. XX, § 21) the traditional defenses were abrogated, judgment is to be speedily derived and prompt payment of the value of the injury must be awarded with a minimum of delay. Respondent immediately took advantage of the act and obtained relief. That judgment is presumed to have been in full satisfaction of his industrial injury. There is neither pleading nor proof that appellant committed an act of negligence outside and beyond the industrial processes of which respondent's labor was a part and in which he was injured. Since that is so, liability to respondent on the part of appellant must not be adjudged. Neither should the courts by an unjustified interpretation of the statute impair the rule of nonliability of the general contractor in the absence of legislative authority.

From the foregoing the conclusion is unavoidable that the trial court committed prejudicial error by instructing the jury that appellant was under a statutory nondelegable duty to provide the safeguards required by sections 7151 and 7152 of the Labor Code.

In support of his contention that he is entitled to recover against the general contractor as the party in charge of the grandstand while undergoing repairs, respondent has cited a number of authorities from foreign jurisdictions. The judgment in each instance was predicated upon a statute that was properly construed. In *Claffy* v. *Chicago Dock & Canal Co.*, 249 Ill. 210 [94 N.E. 551], the statute required the *owner* or *contractor* to "cause the shafts or openings in each floor to be enclosed or fenced in on all sides by substantial barrier or railing at least eight feet in height" and

gave a right of action to a party injured. In *Semanchuck* v. *Fifth Ave. & Thirty-Seventh St. Corp.*, 290 N.Y. 412 [49 N.E.2d 507], a similar statute imposed upon all *contractors* or *owners* when constructing buildings the positive duties for the "protection of employees on building construction . . . work" to plank floor beams and enclose and fence in the sides of a shaft or opening in the floor. The plaintiff having fallen through a shaft was entitled to recover under the statute because the owner and contractor had been negligent in failing to provide the barriers. In *Vollstedt* v. *Joseph A. Mollar, Inc.*, 238 App.Div. 705 [265 N.Y.S. 552]; *Reilly* v. *Charles Herman Cont. Co.*, 89 N.Y.S.2d 632; *Dehaen* v. *Rockwood Sprinkler Co.*, 258 N.Y. 350 [179 N.E. 764]; *Caminiti* v. *Matthews Const. Co.*, 241 App.Div. 879 [272 N.Y.S. 245]; *Employers' Liability Assur. Corp.* v. *Post & McCord*, 286 N.Y. 254 [36 N.E. 135]; *Flanagan* v. *Fred T. Ley & Co.*, 241 N.Y. 607 [150 N.E. 575], the judgments were authorized by the statute requiring the contractor to guard or fence in uncovered holes in the floor. In *McNamara* v. *Eastman Kodak Co.*, 220 N.Y. 180 [115 N.E. 452], the contractor and owner had contrary to statute neglected to plank steel beams.

*Chandler* v. *Glaser Contracting Co.*, 80 N.Y.S.2d 502, is not a holding that the general contractor is liable for a defective scaffold. It decides merely that where a general contractor is charged with negligence he may not sue the subcontractor unless the latter has agreed to indemnify such general contractor. But when the question arose in *Portnoy* v. *United Engineers & Constructors, Inc.*, 90 N.Y.S.2d 486, the author of the Chandler opinion did not hold the general contractor liable for an injury caused by a defective scaffold furnished by the subcontractor.

In support of his contention that a duty is imposed upon the general contractor by reason of the latter's supervision and control, respondent relies upon section 414[3] of the Restatement of Torts and two California decisions. Section 414 is not controlling. No California decision is known to have given to it the meaning ascribed thereto by respondent. Neither is there such a decision from a sister state. Good

---

[3]Rest. Torts, § 414: One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

reason. The section merely imposes upon the owner or general contractor the duty to ''exercise reasonable care'' in his management of the activities under his control. If he engages a painter to do all the painting and that contract obliges the painter to haul his own paints to the premises, to mix and apply them, and to furnish all facilities to be used, the general contractor does not by such agreement assume control over paint brushes, ladders and scaffoldings supplied by the painter. In *La Malfa* v. *Piombo Bros.*, 70 Cal.App.2d 840 [161 P.2d 964], the defendants, general contractors, engaged subcontractors to use their own trucks and drivers to haul material to make a fill on the San Francisco Airport. The wages of all drivers were paid by defendants who carried the workmen's compensation insurance on all truck drivers. The latter were reported as defendants' employees to the insurance carrier. La Malfa as driver of a truck was engaged in doing service for defendants on their roadway and as their invitee. They had built a certain road too narrow for the immediate purposes. The drivers of the several trucks by their confusion increased the hazard of collision. The accident was at night and resulted solely by reason of defendants' negligence in not more intelligently planning the movements of the trucks. They were liable because they were in possession and control of their own roads and negligently directed the driver of plaintiff's truck into a position of peril.

In *Moran* v. *Zenith Oil Co.*, 92 Cal.App.2d 236 [206 P.2d 679], the owner of the premises owned the appliances with which the plaintiff and his fellow workmen performed the task of cleaning the Zenith wells. The cable used had, during the five years' use, deteriorated, of which fact neither the plaintiff nor his foreman had knowledge but which fact was known to Zenith. In short, the owner invited the workmen to render a service and supplied them with death-dealing implements.

In *DeLee* v. *T. J. Pardy Const. Co.*, 249 N.Y. 103 [162 N.E. 599], the defendant falsely represented the scaffold to be strong enough to hold six men and it was not. Not only did that defendant supply the scaffold but also it directed the employees of the subcontractor. On both grounds it was liable.

A general contractor may be liable for injuries resulting from defective appliances only when he has the privilege of selecting them or the materials out of which they

are made (*Roche* v. *Llewellyn Iron Works*, 140 Cal. 563, 569 [74 P. 147]), but he is not liable for injuries caused by defective scaffolds or other instrumentalities unless he has supplied them (*Rae* v. *California Equipment Co.*, 12 Cal.2d 563, 569 [86 P.2d 352]; *Martin* v. *Food Machinery Corp.*, 100 Cal. App.2d 244, 248 [223 P.2d 293]; *Dahms* v. *General Elevator Co.*, 214 Cal. 733, 739 [7 P.2d 1013]; *McCall* v. *Pacific Mail S. S. Co.*, 123 Cal. 42, 44 [55 P. 706].)     There is nothing inherently dangerous in doing work on a high scaffold (*Schmidlin* v. *Alta Planing Mill Co.*, 170 Cal. 589, 592 [150 P. 983]) and therefore it was not incumbent upon appellant to advise respondent against using his own scaffold. *Kalash* v. *Los Angeles Ladder Co.*, 1 Cal.2d 229 [34 P.2d 481], held it obligatory upon every manufacturer of ladders to create them of such materials and so to construct them as to render them reasonably safe to members of the public. That principle is not involved here.

     It follows that neither by the language of the Labor Code nor by appellate decisions is there authority for adjudging a general contractor liable for injuries suffered by a workman on a construction job as the result of a defective scaffold which had been made and supplied by the subcontractor—employer of the injured man.

The trial judge reached a contrary conclusion based largely upon the general language of court decisions and upon what he conceived to be the "tendency" of the law to guarantee workmen against loss. Such tendency does not signify that a workman for a subcontractor shall receive more than his actual loss, assuming the commission has made a fair award. Neither does it mean that the subcontractor shall be wholly relieved from loss by exacting from the general contractor reimbursement for the award made by the Accident Commission against the employer of the injured workman. The tendency of *statutory* law is as suggested by the trial judge, but by no known doctrine may a court go beyond statutory law in fixing liability. It may construe a statute liberally but not rewrite it.

Judgment reversed.

McComb, J., and Fox, J., concurred.

A petition for a rehearing was denied August 7, 1952, and respondent's petition for a hearing by the Supreme Court was denied September 11, 1952. Carter, J., was of the opinion that the petition should be granted.