[Civ. No. 10704. Fourth Dist., Div. Two. Aug. 27, 1971.]

GEORGE E. WIDMAN et al., Plaintiffs and Respondents, v. ROSSMOOR SANITATION, INC., Defendant and Appellant.

738

**COUNSEL**

McCray & Murphy and A. P. G. Steffes for Defendant and Appellant.

Jaffee & Mallery and Arthur J. Jaffee for Plaintiffs and Respondents.

**OPINION**

**KERRIGAN, Acting P. J.**—This lawsuit was initiated by plaintiff, George E. Widman, for the purpose of recovering damages for personal injuries sustained on October 29, 1965, at Leisure World in Laguna Hills, Orange County, California. He was joined in the action by the plaintiff, Marguerite Cagigas, the surviving wife of Henry J. Cagigas, deceased, who was killed in the same accident. The widow initiated the wrongful death action individually and as guardian ad litem of the four minor children of said decedent. Widman's injuries and Cagigas' death occurred when the unsupported wall of a deep trench caved in on them while the two men were shoveling dirt in the bottom of the excavation, acting as employees of an independent contractor.

At the institution of the lawsuit, the following were named as principal defendants: Rossmoor Corporation, which was in the process of developing a large tract of land known as The Leisure World Retirement Center in Laguna Hills; Rossmoor Sanitation, Inc., a subsidiary of Rossmoor Corporation, which was installing the sanitation facilities for the project, and was also the record owner of the land where the cave-in occurred; Toups Engineering, Inc., a firm retained by Rossmoor Sanitation to perform the planning and engineering services necessary for installation of sewer facilities for the entire project; and Elmer Olson, doing business as Elmer Olson, Inc., the owner and operator of a tractor being utilized in digging the particular trench where the cave-in occurred. Pylon, Inc., the contractor engaged to do the excavation work and install the sewer lines, was the employer of Widman and Cagigas, but was not designated as a defendant inasmuch as both men (or their dependents) were entitled to the benefits of the Workmen's Compensation Act (Lab. Code, §§ 3201-6002.) However, Pylon, Inc. was brought into the lawsuit by way of a cross-

complaint for indemnification under a hold-harmless agreement filed by Toups Engineering. Pylon retaliated by filing a cross-complaint against Toups Engineering for indemnity and declaratory relief.

During trial, Toups Engineering settled with plaintiffs and Pylon. Plaintiffs also compromised and settled their claims against Olson, leaving Rossmoor Corporation and Rossmoor Sanitation as the remaining defendants.

The jury awarded Widman $30,000 and the Cagigas heirs $275,000 against Rossmoor Sanitation. The jury also answered special interrogatories in the following manner: (1) Rossmoor Corporation *was not* the owner of the land where the cave-in occurred; (2) Rossmoor Sanitation *was* the owner of said land; (3) Rossmoor Corporation *was not* negligent; (4) Rossmoor Sanitation *was* negligent in proximately causing the accident; and (5) Pylon, Inc., the excavation contractor, *was concurrently negligent* in proximately causing the accident.

Following rendition of the judgment, the parties agreed that the sums plaintiffs received in the form of compensation insurance payments and in settlement of their claims against Toups Engineering and Olson, be deducted or set-off from their respective awards. An order was entered accordingly. Rossmoor Sanitation's motion for a new trial was denied and it appeals from the judgment entered against it.

In early 1964, Rossmoor Corporation undertook a substantial land project in Laguna Hills known as the Leisure World Senior Citizens' Development. It was similar in nature and scope to Rossmoor communities in Seal Beach and Walnut Creek. The Laguna enterprise was to consist of homes and apartments, commercial buildings, commercial shopping centers, hospitals, churches, and recreational facilities. Rossmoor Corporation executed unrecorded deeds to certain portions of the Laguna Hills land to its subsidiary, Rossmoor Sanitation, Inc. One of the parcels deeded by the parent company to Rossmoor Sanitation embraced the site where this accident occurred. The apparent purpose of this deed was to enable Rossmoor Sanitation to construct the sewage pump station and the lines necessary to service the lots within the development.

In September 1964, Rossmoor Sanitation entered into a contract with Toups Engineering wherein the latter firm agreed to provide the engineering and surveying plans required for installation of the sewer and sanitation facilities to service the entire project. In the contract, Toups Engineering agreed not only to prepare the surveys, plans and specifications, but to inspect the installation and construction of all sewer and sanitation facilities.

In June 1965, Toups completed the plans and specifications for the construction of the Aliso Creek Sewage Pump Station and invited bids.

In July 1965, Pylon, Inc., the successful bidder, contracted with Rossmoor Sanitation to furnish the labor, materials and equipment necessary to construct the pump station and the sewer lines leading to and from the station. Pylon also agreed to indemnify Rossmoor Sanitation and its agents against any loss for damages to persons or property arising out of the construction. The contract also contained a proviso to the effect that Rossmoor Sanitation's engineer (Toups) would have the right to supervise and direct Pylon's work.

Pylon, Inc. commenced construction of the pump station and connecting lines. The construction of the pump station constituted only one part of multiple activities in progress at Leisure World. Rossmoor Corporation, the parent company, had a general superintendent, a foreman, and seven inspectors working within the development, as well as a safety director, whose responsibilities included supervision of Rossmoor Sanitation's construction activities. This safety inspector also had the function of inspecting ditches within the project for general safety. Additionally, Rossmoor Sanitation employed several persons on the project, including a field superintendent, whose responsibility was to supervise the grading, excavation, and installation of sewer and water lines.

Similarly, Toups Engineering had at least two engineers or inspectors on the premises regularly in conformity with the aforesaid provision in the Rossmoor-Pylon contract specifying that ". . . [T]he Engineer shall have general supervision and direction of the work." Toups provided daily inspection and progress reports to Rossmoor Sanitation's superintendent. One of the Toups' inspectors was at or near the trench site when the cave-in occurred.

On the day of the accident, Pylon had a superintendent, a foreman, three laborers [including Widman] and one apprentice pipefitter [Cagigas] on the job.

The erection of the concrete pump station in a deep, open pit had been substantially completed prior to the accident. The plans called for the construction of two parallel vertical wall trenches contiguous to the station. These trenches were to be 18 inches apart and were to extend in a generally westerly direction from the station. The plans indicated that the two trenches were to be 30-35 feet in length, over 14 feet in depth, and 30 inches wide. Large sewer pipes were to be laid in both trenches.

Under California law, any excavation over five feet in depth is to be

braced or shored. Consequently, bracing would be required once excavation operations reached five feet in depth.

Prior to the accident, the first trench had already been dug, the pipe laid, and the trench back-filled and compacted. The tractor operator Olson had nothing whatsoever to do with the digging of the first trench and the work on the first trench had been completed the day prior to his appearance at the pump house site.

Pylon had contracted with Olson to dig the second trench. Olson appeared on October 29 with a machine called a "back-hoe"—a heavy tractor used to dig trenches. Attached to the front end of Olson's tractor was a movable hollow metal boom, 15 feet in length, together with a movable scoop shovel, 30 inches in width. Unlike a steam shovel, a back-hoe scoops the earth towards the operator instead of away from him. To support and maintain the equilibrium of the back-hoe during operation, there is attached to the sides of the tractor and extending laterally certain metal extensions or "outriggers" which are adjusted hydraulically to rest firmly on the ground.

Although Olson's boom was only 15 feet long, the overall reach of the boom, with the scoop shovel attached, was 16 feet, 10 inches. However, for some inexplicable reason, Olson was unable to excavate to the required depth of 14 feet, 2 inches, as required by the specifications. By noon he had dug a trench 30-35 feet in length but slightly less than 14 feet in depth.

During the morning hours, the plaintiff, Widman, was not present at the trench site. Cagigas [who was later killed] and a fellow-employee worked in the bottom of the trench, digging with shovels to reach the required depth of 14 feet, 2 inches, while Olson worked the tractor on the surface, removing the shoveled dirt. The sides of the trench were never shored before the accident. Pursuant to Pylon's instructions, Olson had deposited all the earth removed from the second trench on the north bank of the trench. In addition to the excess soil removed from trench No. 2, there was also situated on the north bank of the excavation a pile of dirt apparently left over from the excavation of trench No. 1.

Olson and Pylon's employees went to lunch. Afterwards, the men returned to the excavation site. Trench No. 2 was still slightly less than 14 feet in depth and the east end of the trench "flared out" [in the shape of a bell] in order to accommodate a Y-shaped pipe which was to be laid in the trench and which was to be connected with the pumping facilities in the pump station.

The Olson tractor was standing at the west end of the trench. The first business of the afternoon was to install the Y-shaped pipe in place in the

widened spot in the east end of the trench. The Pylon superintendent evidently left instructions to install the Y-shaped pipe in place as soon as all excess dirt had been removed and then to shore the sides of trench No. 2 before more shoveling was done to reach the specified depth of 14 feet, 2 inches. The jacks required to keep the plywood shoring uprights firmly against the side walls were present at the job site, together with an A-frame—a portable derrick used to install pipe. The A-frame was to be utilized in lowering the Y-shaped pipe into the trench.

Cagigas and another employee descended into the trench on the aluminum ladder located at the east end of the trench where they had been working before lunch. They apparently carried some excess dirt to the other end of the trench where Olson could remove the surplus soil with the scoop and place it on the north bank of the excavation. Plaintiff Widman was ordered to operate the A-frame to lower the Y-pipe into place. He evidently was unfamiliar with the operation of the derrick and was unable to perform the work so he traded places with the laborer who was in the trench with Cagigas. He then joined Cagigas in the trench and they continued with removal of the surplus dirt. While this shovel work was being accomplished, Pylon's superintendent and foreman were present and, with the aid of Cagigas, took sightings with a transit for the purpose of determining whether sufficient soil had been removed to reach the required depth.

After ten minutes of shoveling, Cagigas signalled Olson to reverse the direction in which the back-hoe had been moving and to come closer to where the men were working in the ditch. Olson proceeded along the north bank in the tractor—with a considerable portion of the weight of the tractor resting on the 18-inch partition separating trench No. 1 and trench No. 2. The north bank of the trench collapsed, burying both men. The only persons present at the time of the cave-in were Pylon's employees, Olson, and one employee of Toups Engineering, although there was testimony indicating that a Rossmoor Sanitation foreman had been present at the trench site in the morning. Considerable time elapsed before Widman and the dead body of Cagigas were extricated.

Expert testimony indicates that the north side of trench No. 2 collapsed as a result of one or more of the following factors: (1) The existence of only an 18-inch partition [earth wall] between trenches No. 1 and 2; (2) the full weight of the heavy tractor resting on the partition and the recently filled and compacted trench No. 1; and/or (3) vibrations of the earth caused by the operation of the tractor on the surface.

In seeking a reversal, Rossmoor Sanitation advances the following arguments: (1) The evidence is insufficient as a matter of law to sustain the

judgment under the general rule that the employer [Rossmoor Sanitation] of an independent contractor [Pylon] is not vicariously liable for injury or death to third parties [plaintiffs] resulting from the negligence of the independent contractor; (2) the men [Widman and Cagigas] were guilty of contributory negligence as a matter of law; and (3) the court rendered erroneous instructions of law to the jury.

■ The employer of an independent contractor is ordinarily not liable to third parties for the contractor's negligence. (*Green* v. *Soule,* 145 Cal. 96 [78 P. 337].) However, the general rule is subject to exceptions of such magnitude that they leave only a small area in which the common rule operates. (Rest. 2d Torts, § 410, et seq.; 2 Witkin, Summary of Cal. Law (1960), Torts, § 310, p. 1506.) In fact, the exceptions have almost emasculated the general rule. (Harper, Law of Torts (1933) § 292.)

The first group of exceptions covers situations in which the employer himself [usually a landowner or general contractor] is negligent or otherwise at fault: (1) Where he negligently employs an incompetent contractor or subcontractor; (2) where plans and specifications prepared by the employer negligently requires something to be done which is inherently dangerous or wrong and injury occurs while the contractor is carrying out these directions; (3) where the employer has a nondelegable duty to do certain work carefully, he cannot escape responsibility by delegating the work to an independent contractor, e.g., where the employer has a license to excavate for sewers, water pipes, or to grade or pave streets and, by the terms of a municipal ordinance, is required to exercise certain precautions and avoid such dangerous conditions, he is liable for injuries due to any failure of the independent contractor to take such precautions or to avoid such dangerous conditions; and (4) where an employer operates under a public franchise (e.g., a public carrier, a public utility, or other public service corporation), he or it may be liable for the negligence of an independent contractor. (See 2 Witkin, Summary of Cal. Law (1960), Torts, §§ 311, 312, 313, pp. 1506-1509.)

Notwithstanding the wide range of exceptions to the general rule of nonliability of an employer for the negligent acts of an independent contractor, the rule has usually been followed in cases involving injury to the *employee* of an independent contractor; the *landowner* has ordinarily been held immune for injuries to the contractor's employee; similarly, the rule has also been applied to situations where a subcontractor's employee sought to hold the *general contractor* liable. Denial of recovery to the employee against the *landowner* has been framed in terms of proximate cause; the sole cause of the injury was deemed to be the negligence of the con-

tractor, not the employer, because the employer exercised no control over the construction. (*McDonald* v. *Shell Oil Co.,* 44 Cal.2d 785, 788-789 [285 P.2d 902]; *Bedford* v. *Bechtel Corp.,* 172 Cal.App.2d 401, 407 [342 P.2d 495].) In a like vein, the *general contractor* has been protected against liability for injury to the subcontractor's employee on the premise that it would be an extremely onerous burden to place upon him the duty to enforce all statutory safety provisions where he lacked control of the means utilized to achieve the planned purpose. (See *Hard* v. *Hollywood Turf Club,* 112 Cal.App.2d 263, 274-275 [246 P.2d 716].)

The general rule has been followed in at least one California case which is strikingly similar to the factual situation presented in the case under review. In *Abrons* v. *Richfield Oil Corp.,* 190 Cal.App.2d 640 [12 Cal. Rptr. 271], a judgment of nonsuit was affirmed where the employee of an independent contractor was injured when dirt caved in upon him in a ditch he was digging; the court determined that the employer should not be exposed to liability when he exercised no supervision or control over the contractor's employees, furnished no materials, and had no representatives on the job.

But even in cases involving injury or death to the contractor's employee, there are various factual situations in which the owner has been held legally responsible: (1) Where the employee was injured by some condition of the owner's premises over which the owner retained control and where the owner's duties to the employee were those owing to a business invitee; (2) where the owner furnished the equipment, or was obligated by contract to do so, and the equipment proved to be defective, causing injury to the employee; (3) where the owner actively interfered with or arbitrarily assumed to direct the employees as to the manner and method of performing the work; and (4) where the work being accomplished when the accident occurred constituted a nuisance. (See *McDonald* v. *Shell Oil Co., supra,* 44 Cal.2d 785, 790-791.)

 A relatively new concept has been formulated constituting a fresh exception to the general rule granting immunity to the employer for the independent contractor's negligent acts. This exception finds expression in section 416 of the Restatement Second of Torts and depends on the type or kind of work undertaken by the contractor in behalf of the employer. The section provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to *others* unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions

in the contract or otherwise." [Italics supplied.][1] An employee of an independent contractor comes within the word "others" as used in section 416 of the Restatement. (*Van Arsdale* v. *Hollinger,* 68 Cal.2d 245, 253 [66 Cal.Rptr. 20, 437 P.2d 508].)

In *Van Arsdale, supra,* a city [employer] was held liable, despite its contractual delegation of responsibility to the contractor, for injuries sustained by the contractor's employee, who was struck by a car while eradicating traffic-lane markings on a busy boulevard; at the time of the accident, the employee was working outside the protection of the safety barriers and no flagman was present, although the contractor had agreed to provide a flagman in his contract with the city; there was evidence indicating that without such precautions, the work was ". . . likely to create during its progress a peculiar risk of physical harm . . . ." The Supreme Court held that inasmuch as the work was inherently dangerous, the city had a nondelegable duty to exercise due care and could not avoid its responsibility to third persons by hiring an independent contractor. (*Van Arsdale* v. *Hollinger, supra,* 68 Cal.2d 245, 254-255.)

Turning to the facts of the case under review, the question arises whether the construction of a 14-foot trench on private property may be classified as an inherently dangerous enterprise or constitutes ". . . work which the employer should recognize as likely to create a peculiar risk of physical harm to others unless such special precautions are taken. . . ." The parties concede that at the time of the injury and death involved, title 8, section 1541, California Industrial Safety Orders required that all trenches five feet or more in depth be braced or shored, and that the jury was so instructed.

In *Delgado* v. *W. C. Garcia & Associates,* 212 Cal.App.2d 5 [27 Cal. Rptr. 613], one employee of a subcontractor was killed and another was injured when the sides of a sewer trench collapsed; the injured employee and the decedent's widow filed suit against the city and the subdivision owner; the city had authorized the owner-contractor to install the sewer lines; the owner-general contractor retained a subcontractor to do the sewer work; the subcontractor failed to follow safety orders; under his contract with the city, the owner-contractor agreed to comply with safety precautions against the cave-in of trenches; the city was awarded a judgment of nonsuit but plaintiffs obtained a judgment against the owner-contractor; in affirming the judgment, the reviewing court held that where an activity involving possible danger to the public is carried on under public franchise or authority, the one engaging in the activity may not

[1]The trial court herein instructed the jury in the language of section 416 of the Restatement.

delegate to an independent contractor or subcontractor the duty or liability imposed upon him by the public authority, and that the duty to construct the trench to comply with safety precautions was on the owner-general contractor and could not be entrusted to the subcontractor. While the *Delgado* court indicated that the particular excavation work involved was being conducted pursuant to public franchise or authority, in ruling that the duty was nondelegable, the court emphatically stated that public policy favors allocation of risk where the work being accomplished is inherently dangerous.

■ While *Delgado, supra,* involved a *public street* and a *public franchise or license*, we are confronted with an excavation involving a *private owner of private land*. However, inherently dangerous activities may be conducted on private property through use of an independent contractor, and such activities would include the following: (1) blasting operations; (2) the use of fire in clearing land; (3) the demolition of walls and old buildings; and (4) *excavations on private property*. (See Harper, Law of Torts (1933) § 292; *Snyder* v. *Southern Cal. Edison Co.*, 44 Cal.2d 793, 800-801 [285 P.2d 912].)

But Rossmoor Sanitation counters with the argument that the excavation of land should not be classified as an inherently dangerous activity. The argument might have some appeal where special precautions are taken, such as bracing or shoring. In the absence of such precautions, there is considerable danger to workmen. Evidence was introduced herein reflecting that the California Division of Industrial Safety made a study in 1964-1965 which disclosed that 1 of every 13 workers who receive a disabling injury in a cave-in dies, and that 14 times as many workers die from cave-in of ditches, trenches and other excavation than from accidents occurring in any other type of construction work.

■ Rossmoor Sanitation also maintains that the classification of deep excavation work as an ultra-hazardous activity would expose to liability every poor widow who retains an independent contractor to build her a swimming pool. At first blush, the argument seems to have some integrity, not merely because it involves a widow, but could logically extend to every homeowner or small businessman who hires a contractor to construct any improvement requiring substantial excavation. Nevertheless, the analogy between the widow, small homeowner and small businessman simply fails to apply to Rossmoor Sanitation. Rossmoor cannot equate itself with the average layman. In the first place, the evidence indicates that the Laguna Hills development was a building project of great magnitude; in actuality, it involved the creation of what could be characterized as a city. Rossmoor Sanitation undertook a significant role in this grand-scale development.

Unlike the ordinary person, its officials and employees were knowledgeable in all phases of construction work and recognized, or should have recognized, that the digging of a 14-foot trench was likely to create a peculiar risk of physical harm to others unless special precautions were taken. (See Rest. 2d Torts, § 416.) Rossmoor Sanitation officials had actual knowledge, as distinguished from the ordinary layman, of the existence of the safety order requiring the precautionary bracing or shoring of all trenches over five feet in depth (tit. 8, § 1541, Cal. Div. Indus. Saf., Constr. Saf. Orders) inasmuch as it insisted in the Pylon contract on compliance with such safety orders. Finally, unlike the average layman, Rossmoor Sanitation protected itself against liability for the negligence of both the contractor and the engineer inasmuch as it inserted indemnification clauses in both contracts.

■ Compelling reasons have led the courts to depart from the rule of nonliability of an employer for the torts of an independent contractor: the employer benefits from the work of the contractor he selects; the employer is free to insist upon a competent contractor, one who is financially responsible; the employer is in a position to demand indemnity; the insurance necessary to distribute the risk is properly a cost of the employer's business; and the performance of the duty of care is one of great public importance. (Prosser on Torts (3d ed. 1964) p. 481; 2 Harper & James, Law of Torts (1956) pp. 1405-1406; *Van Arsdale* v. *Hollinger, supra,* 68 Cal.2d 245, 253.)

■ The foregoing policy considerations completely harmonize with the jury's determination of liability herein. Rossmoor Sanitation undertook a significant role in a huge land development—a venture devised and conceived solely for profit. Either directly, or acting through its engineering firm, Rossmoor Sanitation was in a position to demand the appointment of a capable contractor to do the excavation work. As previously noted, it protected itself against loss by indemnification. Rossmoor Sanitation should bear a proportionate share of the loss for the injury and death which occurred on this job. ■ It is common knowledge that workmen injured or killed in construction work do not receive full compensation under the Workmen's Compensation Act for damages that they sustain, notwithstanding the commendable purpose of such legislation. Consequently, a portion of said damages should be allocated to the land developer. Lastly, the public has an interest in the prevention of accidents such as the one which occurred herein, and has a right to insist that safety precautions be taken by the land developer, and in the event he fails to conform to safety requirements,

resulting in injury or death, that the victims be adequately compensated so as not to become a public charge.

■ We therefore conclude that Rossmoor Sanitation was vicariously liable under section 416 of the Restatement Second of Torts for Pylon's negligence in failing to shore trench No. 2.

■ ■ It should also be emphasized that entirely independent of the vicarious liability imposed upon Rossmoor Sanitation under section 416, there was substantial evidence that Rossmoor Sanitation, either directly or indirectly, retained a considerable measure of control over Pylon's activities. Rossmoor Sanitation had employees working in the area in the vicinity of the pump house. Its engineering firm (Toups) likewise had at least two employees—engineers or inspectors—on the job. These men were directed to correct any dangerous condition and had the authority to demand that all underground work conform to safety requirements. Toups Engineering approved the method of excavation and shoring of a certain area near the pump house before the work started. In short, Rossmoor Sanitation and its engineering firm exercised a large measure of control over the job, and the jury was instructed of Rossmoor's potential liability under such circumstances. (BAJI No. 54-F (rev.); Rest. 2d Torts, § 413.) It necessarily follows that the jury could also have found that Rossmoor Sanitation retained sufficient control over the premises to bring it within the rule that an owner of land who reserves control of the premises is an *employer* within the meaning of section 6304 of the Labor Code and subject to the duty to provide a safe place of employment (see *Conner* v. *Utah Constr. & Mining Co.,* 231 Cal.App.2d 263, 270-271 [41 Cal.Rptr. 728]; *Kuntz* v. *Del E. Webb Constr. Co.,* 57 Cal.2d 100, 104-106 [18 Cal.Rptr. 527, 368 P.2d 127]), and that having assumed such control, it had the responsibility for the enforcement of the safety order requiring the shoring of trench No. 2. (See *Conner* v. *Utah Constr. & Mining Co., supra.*)

■ Rossmoor Sanitation next submits that Widman and Cagigas were contributorily negligent as a matter of law. The question of whether an employee is contributorily negligent is ordinarily for the jury. (*McDonald* v. *City of Oakland,* 255 Cal.App.2d 816, 828-829 [63 Cal.Rptr. 593].) The question was strictly a factual one under the circumstances of this case. Cagigas was 27 years old and only an apprentice pipefitter with limited experience in excavation work. Widman was a 29-year-old laborer with little prior experience in excavation work, and had only worked with Pylon for nine months. During that time he had only been involved with one trench in excess of five feet in depth. Not only did these two men work in the trench, but other Pylon employees also worked in it prior to the

cave-in, and Pylon's superintendent and foreman, both of whom were experienced in deep excavation work, permitted them to do so. Toups Engineering's inspector also saw Pylon employees descend into the trench and voiced no objection.

The court rendered thorough instructions on the subject of contributory negligence, and expressly informed the jury that an employee who must work in a dangerous situation may exercise a lesser degree of caution than that required by another person in other circumstances. (BAJI 102-B.) Therefore, the trial court acted with propriety in leaving the issue of contributory negligence with the fact-finder.

■ Turning to the propriety of the instructions given, the first instruction complained of provides as follows: "If you find from the evidence that *PYLON, INC.* violated the provisions of the Industrial Safety Order just read to you [requiring bracing of a 14-foot excavation], and that such violation was the sole cause of plaintiffs' injury, then you are instructed that plaintiffs did not assume the risk of harm created by such violation. However, as to any conduct of the defendant that did not constitute a violation of the Industrial Safety Order the plaintiff [*sic*] may be held to have assumed the risk thereof if you should so find under the instructions given you." [Italics added.] (BAJI 207-F (New).)

Defendant complains that the instruction refers to Pylon, Inc., not to it [Rossmoor Sanitation] and, therefore, the instruction is ambiguous, and the effect of the instruction was to make Rossmoor Sanitation an insurer of the negligent conduct of Pylon and its employees. In view of our foregoing discussion of vicarious liability, the instruction was proper.

We have reviewed the other instructions attacked on appeal (BAJI 213.1, 213-C-2, 213-G) and each represents a correct statement of the law.

The judgment is affirmed.

Gabbert, J., concurred.

A petition for a rehearing was denied September 22, 1971, and appellant's petition for a hearing by the Supreme Court was denied October 21, 1971.