[S.F. No. 23375. July 12, 1976.]

WILLIAM KENNETH BUEHLER et al., Plaintiffs and Appellants, v. OREGON-WASHINGTON PLYWOOD CORPORATION et al., Defendants and Respondents.

COUNSEL

Rawles, Hinkle, Finnegan, Carter & Petersen, Rawles, Hinkle, Finnegan, Brigham, Carter & Petersen, Jared G. Carter and Patrick M. Finnegan for Plaintiffs and Appellants. ·

Steinhart, Goldberg, Feigenbaum & Ladar, Neil E. Falconer, Michael A. Kahn, Bailey Lang, William S. Boyd and Brobeck, Phleger & Harrison for Defendants and Respondents.

OPINION

**THE COURT.**—In this proceeding, involving the interpretation of an agreement creating an easement in real property, plaintiffs William and Jessie Buehler appeal from a summary judgment dismissing their complaint for declaratory relief and for trespass. After decision by the Court of Appeal, First Appellate District, Division Four, reversing the judgment, we granted a hearing in this court for the purpose of giving further consideration to the issues raised. Having made a thorough examination of the cause, we have concluded that the opinion of the Court of Appeal prepared by Justice Christian and concurred in by Presiding Justice Caldecott and Justice Emerson (retired judge of the superior court sitting under appointment by the Chairman of the Judicial Council) correctly treats and disposes of the issues involved, and we adopt such opinion as and for the opinion of this court. Such opinion (with appropriate deletions and additions) is as follows:*

[ ] Appellants' predecessors in interest, Joseph and Mary Campbell, once owned a ranch enclosed by a large land area known as the Garcia tract. In 1908, the Campbells conveyed to the L. E. White Lumber Company (hereinafter White Lumber) and its successors and assigns, all timber then standing on the ranch. White Lumber was also granted an

---

*Brackets together, in this manner [ ] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.)

easement across Campbell Ranch to haul the Campbell timber and any other timber which White Lumber might "acquire upon adjoining land or lands in the vicinity of" the Campbell Ranch.

The easement granted to White Lumber was subsequently transferred to the S. C. Rudolph Lumber Corporation (hereinafter Rudolph Lumber). By 1954, Rudolph Lumber had also acquired property in the Garcia tract formerly owned by White Lumber, and granted an option to several persons, including W. M. Moores and W. H. A. Smith, to purchase the property in the Garcia tract. Shortly thereafter, Moores and Smith, as well as the Cloverdale Redwood Company, were granted licenses to use all timber rights and easements owned by Rudolph Lumber, including the right-of-way created by the Campbell grant. The licensees began removing timber from both the Campbell ranch and the Garcia tract.

Meanwhile, appellants had become the owners of the Campbell ranch. They brought suit in 1955, disputing the right of Moores and Smith, Cloverdale Redwood and Rudolph Lumber to cut and haul timber under the circumstances described above. Appellants then contended that the Campbell grant only permitted the easement holders to cut timber which had become merchantable by 1908; that the definition of "merchantable" timber was to be determined by logging practices existing in 1908 or those followed by White Lumber; that whatever rights the easement holders might have acquired by the Campbell grant had been forfeited by lapse of time; that the ranch had been damaged by careless logging and road building; and that the easement holders were prohibited from using the Campbell easement to haul timber originating outside of the section in which the timber described in the Campbell grant was located.

The action was settled and dismissed, and a "road agreement" was executed and recorded in 1956; it provided that Moores and Smith and Cloverdale Redwood were granted permanent easements in gross "for any purposes reasonably related to the ownership, management and exploitation of timber and forest products which from time to time may be owned or controlled by the owner or owners of said easements . . . ." The easement was assignable only to a partnership or corporation which had acquired operating control of at least one-third of the timber situated in parts of the Garcia tract. Appellants received $10,000 in cash, grazing rights and other considerations. According to the affidavits of

William Buehler and Judge Timothy O'Brien (who had been appellants' attorney), the easement holders had indicated to appellants during the contract negotiations that the easement could only be used to haul timber originating within the Garcia tract. Appellants believed that these understandings were incorporated in the road agreement.

In 1962, the Oregon-Washington Plywood Corporation (hereinafter Oregon-Washington) acquired the Campbell easement, as well as substantially all of the Garcia tract property, from Moores and Smith, Cloverdale Redwood and Rudolph Lumber. In 1965, Oregon-Washington sold virtually all of its Garcia tract property to Longview Fibre Company (hereinafter Longview) while reserving timber rights for itself until December 31, 1971. Appellants first learned in 1969 that Oregon-Washington was hauling timber originating from points outside the Garcia tract. This action was then brought against Rudolph Lumber, Cloverdale Redwood, Moores and Smith, Oregon-Washington, and Longview.

■■ ■■■■ The real issue in this case is the scope of the easement conferred by the road agreement.[1] Respondents make no claim of title to Campbell Ranch except for such rights as they may have under the easement. No trespass can be said to have occurred if Oregon-Washington's rights under the road agreement were as broad as Oregon-Washington has contended.

Oregon-Washington was merged into the Louisiana-Pacific Corporation (hereinafter Louisiana-Pacific) during the pendency of this action. Under the 1965 agreement, Longview had also obtained contract rights to secure, at a later date, a conveyance from Oregon-Washington of its easement rights under the road agreement. The transfer was actually made, between Louisiana-Pacific, as successor to Oregon-Washington, and Longview just prior to the granting of the summary judgment.

The trial court adopted respondents' interpretation of the road agreement, determining that the "language [is] completely clear" and holding that the easement conferred thereunder "may be used and enjoyed . . . regardless of the location of the lands from which such timber and forest products may be derived . . . ."

---

[1]Here, unlike in *Riley* v. *Bear Creek Planning Committee, ante,* at page 500 [131 Cal.Rptr. 381, 551 P.2d 1213], there is no question that an easement was *created;* only its scope is at issue. An easement may be created by express or implied grant, as well as by prescription, although not by parol. (*Elliott* v. *McCombs* (1941) 17 Cal.2d 23, 30 [109 P.2d 329].)]

■ Summary judgment may only be granted if no material fact issue remains in the case. Where affidavits have been submitted by the opposing parties, any doubts as to whether summary judgment is proper should· be resolved against the moving party. (*Pettis* v. *General Tel. Co.* (1967) 66 Cal.2d 503, 505 [58 Cal.Rptr. 316, 426 P.2d 884].)

Appellants contend that the trial court erred in determining that the language of the road agreement was clear, and in disregarding extrinsic evidence which had been presented in opposition to summary judgment. ■ In determining the scope of an easement, extrinsic evidence may be used as an aid to interpretation unless such evidence imparts a meaning to which the instrument is not reasonably susceptible. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, [ ] [521-523 (67 Cal.Rptr. 761, 439 P.2d 889)]. [ ]

Although the agreement [which is set forth in relevant part in the margin[2]] does not specifically state that the easement holders are entitled

---

[2] THIS AGREEMENT made and executed this 15th day of September, 1956, by and between WILLIAM KENNETH BUEHLER and JESSIE BUEHLER, First Parties, and CLOVERDALE REDWOOD CO., a California corporation, and MOORES and SMITH, a partnership, Second Parties,

WITNESSETH:

1. First parties hereby grant to second parties, and to each of them severally, a permanent easement of right of way over and across that certain real property owned by first parties in Mendocino County, California, and lying in Sections 9, 10, 11, 14 and 15, Township 12 North, Range 15 West, MDB & M, to maintain and use certain roads now existing thereon, the approximate location and route of said roads being as shown upon the plot attached hereto as Exhibit A. In addition, second parties may construct a connecting road between the points marked "A" and "B" in Sections 11 and 14.

. . . . . . . . . . . . . . .

3. The easements hereby granted to second parties are easements in gross. Said easements may be used and enjoyed by second parties, their employees, agents, and contractors and second parties may license the use thereof to any partnership or corporation in which second parties (or the stockholders of Cloverdale Redwood Co.) may have a fifty percent (50%) or greater interest. Said easements are assignable, but only to a partnership or corporation which has acquired operating control of at least one-third of the timber situated on the lands described in the Memorandum of Agreement dated April 15, 1954, between S. C. RUDOLPH LUMBER CORPORATION and W. M. MOORES, et al., (recorded in Book 368, page 433, Mendocino County Records) or at least one-third of the timber situated on the lands described in the Memorandum of Agreement dated April 15, 1954, between S. C. RUDOLPH LUMBER CORPORATION and W. M. MOORES, et al., (recorded in Book 368, page 430, Mendocino County Records). Said easements may also be assigned to S. C. RUDOLPH LUMBER CORPORATION.

4. The easements hereby granted may be used and enjoyed for any purposes reasonably related to the ownership, management and exploitation of timber and forest products which from time to time may be owned or controlled by the owner or owners of said easements or by corporation or partnership in which such owners, or if an owner of said easements be a corporation, the stockholder of said owners, have at least a fifty

to use the Campbell right-of-way for hauling timber originating from any source, respondents contend that no other interpretation is reasonable. They argue that a conveyance of an easement in gross, as here, cannot possibly be construed as being subject to territorial restrictions. It is true that the benefit of an appurtenant easement attaches only to the land of the easement holder (see Civ. Code, § 1104; *Moots* v. *Kasten* (1949) 90 Cal.App.2d 734, 736 [203 P.2d 537]; Burby, *Land Burdens in California—Easements* (1930) 4 So.Cal.L.Rev. 115, 118), while an easement in gross runs in favor of the persons specified in the grant. (See *Balestra* v. *Button* (1942) 54 Cal.App.2d 192, 197 [128 P.2d 816]; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 341, [pp. 2041-2042.]) But territorial restrictions are not necessarily absent simply because the parties have limited the use and enjoyment of the easement to a number of specified persons. [Such restrictions, for example, may be directly relevant to the matter of the scope and extent of permitted use. (See generally 3 Miller & Starr, Cal. Real Estate (1971) §§ 715, 722.)]

Respondents point to paragraph four of the agreement, which provided in part that the easements "may be used and enjoyed for any purposes reasonably related to the ownership, management and exploitation of timber and forest products which from time to time may be owned or controlled by the owner or owners of said easements . . . ." But that language does not establish that the easement holders may use the Campbell right-of-way to haul timber from any source. Appellants had claimed in the 1955 lawsuit that the Campbell grant had only authorized removal of timber which was merchantable in 1908. Paragraph four of the road agreement may have been inserted for no other purpose than to resolve that controversy.

[Paragraph three, on the other hand, gives rise to some doubt on the matter of territorial limitation upon the source of timber which may be hauled over the subject road. After stating that the easements are to be in gross, it goes on to consider the question of who may benefit from them. The easements, it is provided, may be used and enjoyed by "second parties"—i.e., Cloverdale Redwood Co. and Moores and Smith—their employees, agents, and contractors as well as any licensee in which second parties had at least a 50 percent interest. (Cloverdale Redwood Co. and Moores and Smith, of course, at the time of the agreement had

---

percent (50%) interest. The use is limited to this purpose only. Said easements may also be used and enjoyed in connection with timber owned or controlled by S. C. RUDOLPH LUMBER CORPORATION for the same purpose.

been granted timber rights in the property of Rudolph Lumber, which comprised the greater part of the Garcia basin.) It was further provided that the easements were to be assignable—but only to a partnership or corporation which had "acquired operating control of at least one-third of the timber situated on the lands described" in the memorandum of agreement by which Rudolph Lumber granted timber rights to second parties in an area known as Unit 1 of the Garcia tract, or had acquired such control of the same proportion "of the timber situated on the lands described" in the memorandum of agreement by which Rudolph Lumber granted timber rights in the areas known as Units 3 and 4 of the Garcia tract. The easements were also to be assignable to Rudolph Lumber itself, the holder of the underlying fee.

 We have concluded that the foregoing provisions, through the manner in which they limit the use and assignability of the subject easements, suggest an intention on the part of the contracting parties that the easements be used solely for the purpose of logging operations relating to the utilization of timber rights in the Garcia basin. Indeed, we can conceive of no reason for the subject limitations if this were not the case. In any event, the language adverted to is in our view reasonably susceptible of the indicated meaning, and as such was subject to clarification by means of extrinsic evidence. (See *Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d 512, 522; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) In granting the motion for summary judgment, and thereby precluding a trial to determine the instrument's true meaning in light of extrinsic evidence adduced by the parties, the trial court was in error.]

The affidavits of William Buehler and Judge O'Brien [clearly support the meaning sought to be attributed to the road agreement by plaintiffs], relating that the original grantees had indicated to appellants during the 1956 contract negotiations that the easements conveyed would only authorize the hauling of timber originating within the Garcia tract. Respondents argue that the affidavits were insufficient in that both Buehler and Judge O'Brien admitted that they could not recall the exact words spoken during the discussion. Under Code of Civil Procedure section 437c, affidavits must set forth admissible evidence within the personal knowledge of the affiant. But the matters stated in the affidavits were unquestionably within the personal knowledge of Buehler and Judge O'Brien. Their inability to recall the exact words of the discussion goes only to the weight, not the admissibility, of their

evidence. (See Evid. Code, § 780, subd. (c); *Wright* v. *Best* (1942) 19 Cal.2d 368, 379-380 [121 P.2d 702].) A triable issue of fact was presented as to whether the road agreement permits the hauling of timber originating outside of the Garcia tract.

Appellants also challenge the trial court's determination that Long-view was a bona fide purchaser. The trial court had based this determination upon an uncontradicted showing that Longview "had no knowledge of any interpretation other than the plain meaning of the document." But the road agreement [had no "plain meaning."] Thus, the issue is whether Oregon-Washington (as Longview's grantor) or Long-view are chargeable with notice of appellants' claims. [ ] It has been said that: " 'In so far as a purchaser has actual or constructive notice of a conveyance or other instrument executed by one previously owning or claiming to own the land, he is charged with notice of all matters stated or referred to in such conveyance, which may possibly affect the title, and he is bound to make any inquiries or researches suggested by such statements or references.' " (*Renden* v. *Geneva Development Corp.* (1967) 253 Cal.App.2d 578, 589, fn. 9 [61 Cal.Rptr. 463], quoting 5 Tiffany, The Law of Real Property (3d ed. 1939) § 1293, p. 77.)

When a "conveyance in a chain of title under which a purchaser for value claims shows on its face it is so ambiguous as to leave room for reasonable difference of opinion as to what was granted, or when the grant contains limiting or qualifying words sufficient to cast reasonable doubt on what was intended to be granted, the purchaser will be chargeable with notice of this ambiguity, and the effect of these limiting or qualifying words, and his rights, if controversy comes up, must be left to be determined by the courts, . . ." (*Hudson & Collins* v. *McGuire* (1920) 188 Ky. 712, 723-724 [223 S.W. 1101, 1105-1106; 17 A.L.R. 148, 155], cited in 8 Thompson, Commentaries on the Modern Law of Real Property (1963) § 4310, p. 349; accord, *Weniger* v. *Ripley* (1930) 134 Ore. 265, 269 [293 P. 425, 427]. But see *Richardson* v. *Lee Realty Corp.* (1974) 364 Mass. 632 [307 N.E.2d 570, 573].)

A triable issue of fact exists as to whether Oregon-Washington or Longview should have investigated any competing claims under the road agreement. (See *Renden* v. *Geneva Development Corp., supra,* 253 Cal.App.2d at p. 589; 8 Thompson, *supra,* § 4310, pp. 349-350.)

Respondents claim that the understanding allegedly reached by the contracting parties with respect to the easements was an unrecorded

"side agreement" and, as such, was void as against any subsequent purchasers for value. (See Civ. Code, §§ 1214, 1217.) But, according to William Buehler's deposition, he believed that the parties' understanding had been incorporated in the road agreement.

[ ] [The judgment is reversed.]

**MOSK, J.**—I dissent.

Once again the majority of this court renders the content of a written instrument, entered into by parties bargaining on a basis of equality and represented by legal counsel, subject to drastic ad hoc revision years later by parol testimony concerning hidden meanings, nuances and purported intents not reflected in the instrument.

Here we have an easement in real property. Apparently the certainty historically surrounding recorded interests in real property is now to be subjected to the melancholy fate of rules of evidence in contract law which have heretofore been reduced to a shambles in this state.

It may not be fashionable today to defend the traditional parol evidence rule. However in my dissent in *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 532 [72 Cal.Rptr. 785, 446 P.2d 785], I pointed out the concern of the legal profession: "Now, however, that the majority deem negotiations leading to execution of contracts admissible, the trend has become so unmistakably ominous that I urge a halt.

"It can be contended that there may be no evil per se in considering testimony about every discussion and conversation prior to and contemporaneous with the signing of a written instrument and that social utility may result in some circumstances. The problem, however, is that which devolves upon members of the bar who are commissioned by clients to prepare a written instrument able to withstand future assaults. Given two experienced businessmen dealing at arm's length, both represented by competent counsel, it has become virtually impossible under recently evolving rules of evidence to draft a written contract that will produce predictable results in court. The written word, heretofore deemed immutable, is now at all times subject to alteration by self-serving recitals based upon fading memories of antecedent events. This, I submit, is a serious impediment to the certainty required in commercial transactions."

The problem is exacerbated in the field of land titles where certainty and stability are the watchwords of an orderly society. For more than a half century the rule applicable to the circumstances before us has been understood and accepted. It was described clearly in. *Werner* v. *Graham* (1919) 181 Cal. 174, 185: "This whole discussion may in fact be summed up in the simple statement that if the parties desire to create mutual rights in real property of the character of those claimed here they must say so, and must say it in the only place where it can be given legal effect, namely, in the written instruments exchanged between them which constitute the final expression of their understanding."

The written instrument, entitled Road Agreement, was duly executed and recorded in 1956. In it the plaintiffs granted to defendants' predecessors in title permanent road easements in gross for the hauling of timber across a ranch in Mendocino County owned by the plaintiffs. No territorial restrictions were imposed as to the source of the timber which could be transported across easement roads; to the contrary, the agreement gave the easement holders the right to haul timber and forest products "which from time to time may be owned or controlled by the owner or owners of said easements . . . ." The criterion was clearly ownership or control of the products, not their geographic source.

Fourteen years after the original conveyance was recorded, plaintiffs brought this lawsuit against the successors of the original grantees, alleging that, despite the terms of the written instrument, plaintiffs had not subjectively intended to grant an easement in gross but really meant to restrict the use of the easement to the hauling of timber originating in the Garcia River Basin, a small watershed on the Mendocino coast. The trial court properly held that pursuant to *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], the language of the agreement granting the easements was clear and not reasonably susceptible of plaintiffs' purported interpretation.

It is a heroic conclusion to find ambiguity on the face of this written instrument. Plaintiff contends the ambiguity arises because the conveyance does not specifically impose a territorial limitation on the source of the timber. I find it to be a disturbing concept that any subject, conjured up 14 years after recording of the instrument, can be deemed to create an ambiguity solely because it was omitted from the text of the instrument. In other words, what was not provided in the document becomes more significant than what was provided—a strange new doctrine that should

cause members of the bar who prepare contracts to hurriedly increase their legal malpractice coverage.

The majority add to the adopted Court of Appeal opinion a conclusion that territorial boundaries may be inferred from the limitation as to parties who may use the easement and from the limitation on assignability. The argument is a non sequitur. Understandably an owner of real property who conveys away easement rights desires to know who will cross his land presently and in the future, and how responsible they may be. It is a far distance in logic from that protective purpose to an irrelevant insistence that the hauled timber originate in one tract rather than another.

Of most concern to the commercial community will be the violence committed by the majority opinion to the heretofore undeniable right of a bona fide purchaser to rely on recorded indicia of title. Since the recorded agreement unequivocally described the easements as "easements in gross," by very definition there was an exclusion of limitation to any specified dominant tenement. When these defendants acquired the rights to the easement, they were entitled to rely on the instrument as recorded. The additional requirement imposed upon bona fide purchasers by the majority: investigation of any competing claims—and how are they to learn of unrecorded competing claims?—casts into potential doubt the meaning of all documents conveying an interest in real property.

I would affirm the judgment.

McComb, J., and Clark, J., concurred.

The petition of respondents Longview-Fibre Company and Louisiana-Pacific Corporation for a rehearing was denied August 11, 1976. Mosk, J., and Clark, J., were of the opinion that the petition should be granted.