[Civ. No. 47517. Second Dist., Div. Four. Dec. 20, 1976.]

LINK-BELT COMPANY, Plaintiff and Appellant, v.
STAR IRON AND STEEL COMPANY, Defendant and Respondent.

---

**COUNSEL**

Virgil R. Wells for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Wesley G. Howell, Jr., and Dennis A. Gladwell for Defendant and Respondent.

---

**OPINION**

FILES, P. J.—This is an action by Link-Belt Company, a division of FMC Corporation (hereinafter Link-Belt) against Star Iron and Steel Com-

pany (hereinafter Star) to recover the amount of a judgment which Link-Belt has been required to pay on account of the wrongful death of a man named Green and the personal injuries suffered by a man named Harris. Star moved for summary judgment upon the principle that a party who has been found actively negligent in causing a particular occurrence has no cause of action for implied indemnification.[1] The motion was granted and judgment for Star was entered, from which Link-Belt appeals.

The action for personal injuries and wrongful death (hereinafter the *Green-Harris* case) arose out of the collapse of a crane owned by the City of Los Angeles and used at Los Angeles Harbor. In 1959 Link-Belt acquired the crane, used, for the purpose of modifying and reselling it to the city. Link-Belt entered into a written contract with Star, whereby Star, for a price of $22,000, agreed to remodel and repair the crane in certain respects, replace certain parts and restore the crane "to good running condition." After Star completed its work at Tacoma, Washington, the crane was shipped to Los Angeles, where Link-Belt made further modifications and repairs before the crane was accepted by the city. The *Green-Harris* accident occurred on March 30, 1968, while the crane was being used in loading a ship at Los Angeles Harbor.

The *Green-Harris* action was tried to the court, sitting without a jury. With respect to the liability of Link-Belt the trial court found the following among other things: following the work done by Star under its 1959 contract the crane was delivered to Los Angeles Harbor in an unassembled condition. During the course of reassembly of the crane Link-Belt made modifications in the luffing drum assembly and introduced a "Link Belt gear reduction system." Link-Belt replaced the original 50-foot boom with a 70-foot boom and installed new electrical controls, motors and gear drives. Link-Belt also attempted to increase the load capacity of the crane by adding approximately 3000 additional pounds to the counterweight; and, after a series of tipping tests, rated the capacity of the crane at 7.5 tons at a 51-foot load radius. Although it was proper practice to conduct visual and scientific tests of the critical components, including the luffing drum shaft, Link-Belt failed to make any such tests during that period.

[1]For pertinent discussion of this principle, see *Morgan* v. *Stubblefield* (1972) 6 Cal.3d 606, 625 [100 Cal.Rptr. 1, 493 P.2d 465]; *Gardner* v. *Murphy* (1975) 54 Cal.App.3d 164 [126 Cal.Rptr. 302]; *Burlingame Motor Co.* v. *Peninsula Activities, Inc.* (1971) 15 Cal.App.3d 656 [93 Cal.Rptr. 376]; *King* v. *Timber Structures, Inc.* (1966) 240 Cal.App.2d 178 [49 Cal.Rptr. 414]; *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 375 [25 Cal.Rptr. 301]; 4 Witkin, Summary of California Law (8th ed. 1974) Torts, sections 50-52.

The injury to Harris and the death of Green occurred because a shaft in the luffing drum assembly failed due to a fatigue crack which had started several years prior to March 30, 1968. The failure of the shaft permitted the boom to fall.

The trial court's conclusion of law declared: "City is entitled to be indemnified by Link Belt by reason of City's relation to the plaintiffs as an owner of said waterfront facility and appurtenances thereto making City secondarily and passively liable for the active and primary wrongdoing and negligence of Link Belt."

The court awarded judgments totalling $251,213.93 against Link-Belt and the owner of the ship. The shipowner was given judgment against Link-Belt, the city and two other parties for indemnification in whatever amount the shipowner was required to pay to plaintiffs. The city and the other defendants were given judgment of indemnification against Link-Belt in whatever amount they were required to pay plaintiffs.

An appeal was taken by Link-Belt and the judgment was affirmed. (*Green* v. *City of Los Angeles* (1974) 40 Cal.App.3d 819 [115 Cal.Rptr. 685].)

Star was not a party to the *Green-Harris* case. Link-Belt's motion to join Star as a cross-defendant in that case was denied as untimely. Link-Belt thereupon commenced this action against Star by filing its "complaint for indemnification." This complaint, which was filed before the *Green-Harris* case was tried, alleged that if Link-Belt was held liable in the *Green-Harris* action, "the basis of such liability is and will be [Link-Belt's] passive, indirect or secondary negligence as distinguished from the active, direct or primary negligence" of Star.

After the *Green-Harris* judgment had become final, Star made a motion for summary judgment in this action, based upon the findings of fact and conclusions of law and the appellate court opinion in the *Green-Harris* case. Copies of those documents were attached to the notice of motion.

In opposition to the motion Link-Belt submitted a copy of Star's 1959 repair proposal and some excerpts from deposition testimony.

At the hearing of the motion the attorney for Link-Belt stated that he was proceeding upon a warranty theory, and that the negligence of Link-Belt was immaterial.[2]

Link-Belt does not dispute that some species of active negligence on its part was adjudicated in the *Green-Harris* case. (See *Burlingame Motor Co.* v. *Peninsula Activities, Inc., supra,* 15 Cal.App.3d 656, 662.) Rather, it contends that, upon each of two theories, this finding does not bar a recovery against Star. One is that the action is based upon a breach of warranty. The other theory is that the law of implied indemnity should be reexamined in the light of the new comparative negligence rule established in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].

The contention that this action is not one for indemnification confuses the source of the underlying right with the nature of the remedy.

█ Indemnification, as a form of relief, may be based upon a contractual obligation (see Civ. Code, § 2772) or it may be based upon equitable considerations without a contractual relationship between the parties. Thus, in *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, at page 628 [119 Cal.Rptr. 449, 532 P.2d 97], the court said: "Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred. [Citation.] This obligation may be expressly provided for by contract [citation], it may be implied from a contract not specifically mentioning indemnity [citation], or it may arise from the equities of particular circumstances . . . ."

In the present case there is no contention that Star ever promised expressly to indemnify Link-Belt against loss or liability. If Star is under any duty to indemnify, it must arise by implication from the contract, or from the equities of the situation. Link-Belt's theory appears to be in essence, that Star warranted the crane to be free from defects, that this warranty was breached in that the crane contained a defective part, and that by reason of that breach Link-Belt was damaged to the extent that it was required to pay the *Green-Harris* judgment. █ The relief sought is that Star make good the loss which Link-Belt incurred by reason of the

[2]"MR. WELLS [attorney for Link-Belt]: . . . . Now, if we were going on the negligence theory, I would certainly agree with the Court because one who is actively negligent cannot proceed against another for indemnity. There has been a case that's just come down, I think the last few days, the Rossmoor case from the Supreme Court, that points that out. But here we are going on a warranty theory where the negligence of the party seeking indemnity is not a defense."

*Green-Harris* judgment. That is a demand for indemnification pure and simple, even though Star's duty is alleged to have arisen out of the 1959 contract to repair the crane. The right to recover is thus subject to the limitations which the case law has established precluding indemnification for the consequences of one's own negligence.

A contention similar to that made by Link-Belt here was rejected by the Supreme Court in *County of Alameda v. Southern Pac. Co.* (1961) 55 Cal.2d 479 [11 Cal.Rptr. 751, 360 P.2d 327]. In that case a rock company had made an agreement with the railroad which included a promise by the rock company to maintain a grade crossing. The railroad was under a common law duty to maintain it. The crossing was not properly maintained. A truck attempting to use the crossing was damaged, and its owner recovered a judgment against the railroad, which then sought to recover from the rock company. The Supreme Court said (at p. 487): "It is Southern Pacific's theory, which was adopted by the trial court, that the breach of this contractual duty by Rock proximately and foreseeably led to the accident to the Cali truck and the necessity of Southern Pacific's responding in damages therefor. Southern Pacific therefore argues that it is not an action for indemnification but rather a simple contract action for the damages proximately resulting to it from Rock's breach of the contract to maintain. But the cases in California upon which Southern Pacific relies have treated such an action based upon the violation of a contract duty to the plaintiff by the defendant which resulted in a tort judgment against the plaintiff by a third person as being upon a cause of action on an implied promise to indemnify. (*De La Forest v. Yandle,* 171 Cal.App.2d 59, 61-62 [340 P.2d 52]; *San Francisco Unified Sch. Dist. v. California Bldg. etc. Co.,* 162 Cal.App.2d 434, 440, 449 [328 P.2d 785]) and the cases cited and discussed in the latter case (162 Cal.App.2d at pp. 444-448) indicate that courts generally, where they allow such an action, treat it as one for recovery on an implied promise to indemnify the promisee for damages which the promisee is compelled to pay because of the breach by the promisor of his express promise."

The trial court judgment in favor of the railroad against the rock company was reversed upon the ground that the contract between those parties contained no language expressly calling for indemnification of the railroad against its own negligence.

In the present case, since the recovery sought is indemnification, Link-Belt cannot escape the consequences of its own negligence by characterizing the action as one for breach of warranty.

Link-Belt's contention that *Li v. Yellow Cab Company, supra,* 13 Cal.3d 804, has changed the law of indemnification relies upon a sentence in *Burlingame Motor Co. v. Peninsula Activities, Inc., supra,* 15 Cal.App.3d 656, a case in which the appellant was denied indemnification upon the ground that its contract did not clearly specify that it was to be indemnified for its own negligence. The court said (at p. 664): "If comparative negligence were the law as between indemnitor and indemnitee, appellant's argument might be persuasive."

Whatever the *Burlingame* court meant by this remark in a case which antedated the *Li* decision, it is not authority for a post-*Li* change in the law of indemnity. There is nothing in the *Li* opinion to suggest that the Supreme Court intended any change in the long-established case law governing indemnification as between tortfeasors.

In *Gardner v. Murphy* (1975) 54 Cal.App.3d 164 [126 Cal.Rptr. 302] the court pointed out that the transfer of loss through indemnification rests upon a determination unlike that which is the basis of the sharing of liability under comparative negligence. The court said at page 168: "This difference in the character or kind of wrong which each joint tortfeasor has done to the injured third person is thus the essential foundation for the shift in liability between them accomplished by means of indemnification. This transfer in liability is not done simply because the two tortfeasors are not *in pari delicto* (see *Herrero v. Atkinson,* 227 Cal.App.2d 69, 74 [38 Cal.Rptr. 490, 8 A.L.R.3d 629]) or because the negligence or wrong of one is greater than that of the other as in pure comparative negligence. (See *Li v. Yellow Cab Co.,* 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226]; *American Can Co. v. City & County of San Francisco,* 202 Cal.App.2d 520, 525-526 [21 Cal.Rptr. 33.]) Equitable indemnity is not a sharing in liability in proportion to fault as pure comparative negligence is. It is instead a total and complete transfer of liability that is equitably justified by the difference in character or kind of the wrongs of the two tortfeasors. (See *Alisal Sanitary Dist. v. Kennedy,* 180 Cal.App.2d 69, 75 [4 Cal.Rptr. 379].)"

The long line of cases establishing the rules under which an entire loss may be shifted from one tortfeasor to another is binding upon this court, and may not be disregarded upon the basis of any asserted analogy with the *Li* case.

The judgment is affirmed.

Dunn, J., concurred.

**JEFFERSON (Bernard), J.**—I dissent. I believe there are triable issues of fact in the case at bench.

The majority upholds the summary judgment in favor of defendant Star on the theory that plaintiff Link-Belt's cause of action against Star is necessarily an action for indemnification, and that Link-Belt cannot recover because of the law of implied indemnity which precludes recovery by a plaintiff found to be actively negligent.

The majority's views are based upon dicta. The major premise of the majority is that there can be no cause of action for breach of an implied contract, such as an implied warranty of merchantability or fitness, without the application of the indemnity doctrine of active-passive negligence, if the plaintiff's cause of action is predicated on shifting a tort liability of plaintiff to defendant. I do not consider this premise to be well founded.

The second premise of the majority, which follows from acceptance of the first premise, is that some species of active negligence on the part of Link-Belt was adjudicated in the *Green-Harris* litigation, and that this determination precludes any triable issue on this matter between Link-Belt and Star in the case before us. This second premise has a fatal flaw. The prior adjudication related to factual and legal issues between Link-Belt and the City of Los Angeles as to liability to the *Green-Harris* plaintiffs. Defendant Star was not a party to the *Green-Harris* action. Hence, there has been no determination or adjudication of any negligence on the part of Link-Belt—active or passive—with respect to the factual and legal issues involved in Link-Belt's relationship with Star.

There is no doubt that the concept of "indemnity" is a broad one, and the term is used to cover many situations. Thus, sections 2772 to 2784.5 of the Civil Code constitute title 12 of said code, which is labelled "Indemnity." Civil Code section 2772 defines indemnity as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Similarly, Civil Code section 2527, in defining "insurance," uses the following language: "Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability, arising from an unknown or contingent event." We find the same definition of "insurance" set forth in section 22 of the Insurance Code.

However, the fact that the term, "indemnity," is used in such a broad fashion does not lead to the conclusion that the determination of rights

and duties between parties is predicated on a uniform set of legal rules that apply to every lawsuit which may fall under the classification of the term, "indemnity," any more than a cause of action falling under the broad concept of torts would require application of the same set of requirements irrespective of the particular tort involved.

In contending that the trial court erred in granting defendant Star's motion for summary judgment, plaintiff argues that said defendant's contract with plaintiff included an implied warranty of merchantability by defendant, and that plaintiff's complaint, while entitled an action for indemnity, alleges such a warranty and the breach thereof in addition to the normal indemnity allegations. Plaintiff asserts that it is entitled to go to trial against defendant on the warranty cause of action without regard to the law of implied equitable indemnity. Clearly, plaintiff's complaint contained the allegations necessary to state a cause of action for breach of implied warranty, including allegations that defendant Star had been given notice of such breach. (*Faucette* v. *Lucky Stores, Inc.* (1963) 219 Cal.App.2d 196 [33 Cal.Rptr. 215].)

The majority relies on *County of Alameda* v. *Southern Pac. Co.* (1961) 55 Cal.2d 479 [11 Cal.Rptr. 751, 360 P.2d 327], as holding that any action based upon a violation of a contract duty to the plaintiff by the defendant which resulted in a tort judgment against the plaintiff by a third person is construed as being upon a cause of action on an *implied promise to indemnify*. This concept is stated in *County of Alameda,* but this is not the actual holding of the case. In *County of Alameda,* Southern Pacific had set forth in its contract with California Rock express provisions for indemnity in *two specific* particulars. *County of Alameda* held, therefore, that Southern Pacific would have likewise made *express* provision for indemnity against its liability based on Southern Pacific's negligent failure to maintain the track in proper condition "*if it had intended to bind Rock to such an obligation.*" (*County of Alameda, supra,* 55 Cal.2d 479, at p. 488.) (Italics added.)

The contract between Link-Belt and Star is not at all similar to the contract between Southern Pacific and California Rock. In 1959, plaintiff acquired the used crane, involved in the *Green-Harris* accident, from the Isaacson Iron Works. The crane had originally been built by defendant Star in 1931. In 1959, plaintiff contracted with defendant Star for the "remodeling and repair" of the disassembled, used crane at Tacoma, Washington. Defendant Star undertook in this contract to furnish certain enumerated parts that needed replacement, to "junk all equipment not

suitable for use" and to "check, clean and repair all machinery to restore [the crane] to good running condition."

Although the instant case does not involve a sale, the law of implied warranties with respect to sales provides a compelling analogy to the situation involved in the case at bench. Thus, California Uniform Commercial Code section 2314 provides for the implied warranty of merchantability and section 2315 of the same code provides for the implied warranty of fitness for a particular purpose.

The California Uniform Commercial Code provisions relating to the damages which a buyer is entitled to recover for a seller's breach of the implied warranties set forth in sections 2314 and 2315, establishes a legislative policy which appears to me to be equally applicable to the case at bench in terms of a reasonable and sound decisional-law policy. In addition, California Uniform Commercial Code section 2715 provides that a buyer may recover incidental and consequential damages resulting from a seller's breach of warranty. Specifically, California Uniform Commercial Code section 2715, subdivision (2)(b), sets forth that consequential damages resulting from a seller's breach include "[i]njury to person or property proximately resulting from any breach of warranty." This consequential-damage provision, enacted in 1963 as part of California's adoption of the Uniform Commercial Code, is consistent, however, with the same law of damages found in former Civil Code sections 1789 and 1790. (See Cal. Code Comment to U. Com. Code, § 2714.)

It is significant that California Uniform Commercial Code section 2715 does not, through its express language, limit its application to injury to the *buyer's* person or property. Nor does section 2715 require any application of the active-passive negligence dichotomy to a buyer's action against a seller for breach of warranty for consequential damages of injury to person or property.

It is to be noted that the majority upholds the granting of summary judgment to defendant Star—thus denying to plaintiff a trial on the merits. The summary judgment process has been described in numerous reported cases. " 'The matter to be determined by the trial court in considering such a motion [for summary judgment] is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. . . . The aim of the procedure is to discover, through the media of affidavits, whether the

parties possess evidence requiring the weighing procedures of a trial.' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].) "Under well established rules governing summary judgment motions, the affidavits of the moving party are to be strictly construed and those of the opponent liberally construed. [Citation.]" (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].)

And in the recent case of *Buehler* v. *Oregon-Washington Plywood Corp.* (1976) 17 Cal.3d 520, 526 [131 Cal.Rptr. 394, 551 P.2d 1226], we were reminded that "[s]ummary judgment may only be granted if no material fact issue remains in the case. Where affidavits have been submitted by the opposing parties, any doubts as to whether summary judgment is proper should be resolved against the moving party. [Citation.]"

My initial concern, therefore, centers upon the question of whether plaintiff's cause of action for warranty presents triable factual issues, even though the majority's analysis considers, erroneously in my opinion, that such a cause of action cannot be distinguished from the law of implied indemnity.

Defendant Star argues that, under California law, apart from the question of implied indemnity, implied warranty of merchantability has no application to a contract for services such as that under which defendant undertook the reconditioning of the crane, and that, in any event, plaintiff's cause of action for warranty is barred by the applicable statute of limitations, although this defense had not been pleaded by defendant.

It has long been established in sales transactions that there is implicit in the contract the seller's warranty of merchantability, i.e., that the subject goods are fit for their intended purpose. The elements of this implied warranty were originally contained in section 1735 of the Civil Code, but now may be found in the California Uniform Commercial Code, sections 2314-2316. The warranty is in the nature of an obligation imposed by law, although founded on contract. Much of the decisional law in this area of implied warranty concerns sales transactions, but the statutory guidelines contained in the Commercial Code sections mentioned above (and their predecessors) have been applied to other types of transactions as well. (*Holmes Packaging Mach. Corp.* v. *Bingham* (1967) 252 Cal.App.2d 862 [60 Cal.Rptr. 769] (implied warranty applicable to bailment contracts).)

With the introduction into tort law of strict liability for defective products (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]), the use of the warranty cause of action independently has diminished, as the causes of action are very similar, although one is founded on tort principles and one on contract principles. "In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." (West's, Cal. U. Com. Code, § 2314, U. Com. Code Comment, pp. 268-269, Deering's, Cal. U. Com. Code, U. Com. Code Comment, p. 163.)

In the case at bench, the contract between the plaintiff Link-Belt and defendant Star was not a sale. Defendant Star contends that implied warranty of merchantability is not applicable to a contract of reconditioning and repair of a chattel, as the essential item offered plaintiff by defendant was the latter's services, rather than a tangible piece of property.

Plaintiff, however, in asserting that warranty principles apply to the contractual transaction between plaintiff and defendant, relies on the California Supreme Court case of *Aced* v. *Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573 [12 Cal.Rptr. 257, 360 P.2d 897], which held that a construction contract calling for labor and materials, while not a sale, was a contractual transaction giving rise to an implied warranty of merchantability. *Aced* was a suit by a general contractor (in a cross-complaint) against a subcontractor, seeking damages for loss sustained from the installation by the subcontractor of defective tubing in a cement floor. The tubing was part of a radiant heating system and eventually corroded, causing leakage. The general contractor attempted to invoke the warranty provisions set forth in the then Uniform Sales Act (Civ. Code, §§ 1734-1736). The Supreme Court rejected the contract-of-sale approach, characterizing the installation contract as one for labor and materials rather than a sale, but held that, despite the absence of statutory law, "[t]here may nevertheless be an implied warranty [of merchantability]. . . . similar warranties may be implied in other contracts not governed by such statutory provisions *when the contracts are of such a nature that the implication is justified.*" (*Aced, supra,* 55 Cal.2d 573, at p. 582.) (Italics added.)

Thus did *Aced* enlarge upon the principle contained in *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 486 [275 P.2d 15]. *Aced* stated that it was

said in *Gagne* "that for historical reasons warranties have become identified primarily with transactions involving the sale or furnishing of tangible chattels but that they are not confined to such transactions. Several cases dealing with construction contracts and other contracts for labor and material show that ordinarily such contracts give rise to an implied warranty that the product will be fit for its intended use both as to workmanship and materials. [Citations.]" (*Aced, supra,* 55 Cal.2d 573, at p. 582.)

Defendant Star seeks to avoid the application of *Aced* to the instant case by asserting that *Aced* applies the doctrine of warranty of merchantability to a nonsale contract only when a defendant has supplied some *part* of a product or an *article* which was defective and such defectiveness caused the damage. That *Aced* cannot be construed so narrowly is seen in the language of *Aced* giving approval to the principle found in *Gagne* that contracts for labor and material give rise to an implied warranty that the product will be fit for its intended use "both as to *workmanship* and materials." (*Aced, supra,* 55 Cal.2d 573, at p. 582.) (Italics added.)

In addition, *Aced* has been the basis for a recent decision of the California Supreme Court. In *Pollard* v. *Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374 [115 Cal.Rptr. 648, 525 P.2d 88], the court applied the doctrine of implied warranty of merchantability to a contract for the construction of a new building. *Pollard* interprets *Aced* as rejecting the view that implied warranties are limited to contracts within the sales act and as holding "that an implied warranty of merchantability arises from a contract to build a portion of a building because the contract is one for *material and labor.*" (*Pollard, supra,* 12 Cal.3d 374, at p. 378.) (Italics added.)

But in extending the doctrine of implied warranties to a contract to build an entire building, *Pollard* emphasizes the nature of the contract as essentially one for material and labor and interprets the implied warranty as "an implied warranty protecting the owner from *defective construction.*" (*Pollard, supra,* 12 Cal.3d 374, at p. 378.) (Italics added.) The *Gagne, Aced* and *Pollard* cases make it clear that the implied warranty of merchantability or suitability imposed in contracts for labor and material protect against defective workmanship and defective construction as well as against defectiveness of an article, material or goods.

We agree with defendant Star that decisional law has held that the principle of implied warranty is not to be imposed with respect to a contract for the performance of *services* as contrasted with a contract for labor and materials. " '[T]he general rule is . . . that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable [for breach of implied warranty] in the absence of negligence or intentional misconduct.' " (*Allied Properties* v. *John A. Blume & Associates* (1972) 25 Cal.App.3d 848, 856 [102 Cal.Rptr. 259].) "[T]he well settled rule in California is that where the primary objective of a transaction is to obtain services, the doctrines of implied warranty and strict liability do not apply [citation]." (*Allied Properties, supra,* 25 Cal.App.3d 848, at p. 855.)

The *Allied Properties* case involved the services of a marine engineer in designing a structually sound pier. A denial of implied warranty liability has been upheld for various types of professional service contracts. (See *Roberts* v. *Karr* (1960) 178 Cal.App.2d 535 [3 Cal.Rptr. 98] (surveyor); *Gautier* v. *General Telephone Co.* (1965) 234 Cal.App.2d 302 [44 Cal.Rptr. 404] (communication services); *Stuart* v. *Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802 [110 Cal.Rptr. 543] (engineer); *Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132] (blood transfusion).)

It is defendant Star's contention that the repair and reconditioning of plaintiff's crane constitutes a service rather than a contract for goods and labor, and that, consequently, no warranty should be implied. In considering this contention, I turn to the language of the contract itself—primarily the language of defendant Star's bid—and interpret it, an appellate function that must be exercised independently of the trial court. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839].) The contract contemplated the replacement by defendant of the crane's component parts, as needed, and the checking, cleaning and repair of the crane. Defendant promised to restore the crane to "good running condition." The subject matter appears to me to be far closer to supplying labor and materials than it does to the performance of a service. I conclude, therefore, that the contract is one for material and labor where the imposition of warranty liability is justified under the principles enunciated in *Aced* and *Pollard.*

The *Aced* court did not expand upon the meaning to be given to its statement that warranties similar to those found in the Uniform Sales Act (Civ. Code, §§ 1734-1736) may be implied in other contracts not

governed by such statutory provisions "when the contracts are of such a nature that the implication is justified." (*Aced, supra,* 55 Cal.2d 573, at p. 582.) "Justification" seems to suggest that considerations of policy are the main determinative of whether implied warranty exists. This idea is amplified in *Pollard* where it is stated that "[t]he doctrine of implied warranty in a sales contract is based on the actual and presumed knowledge of the seller, reliance on the seller's skill or judgment, and the ordinary expectations of the parties. [Citation.]" (*Pollard, supra,* 12 Cal.3d 374, at p. 379.) In my view, similar considerations of policy justify attaching an implied warranty of quality to contracts calling for the reconditioning—including the replacement of parts—of industrial machinery intended for heavy use.

Defendant Star also makes the contention that summary judgment was properly granted by the trial court because the plaintiff's alleged breach of warranty cause of action was barred by the statute of limitations; defendant argues that the appropriate statute is the two-year limitation set forth in Code of Civil Procedure, section 339, subdivision 1, for oral contracts. Plaintiff Link-Belt claims that, pursuant to *Aced,* the four-year limitation on actions based on written contracts applies.

It has been said that the general rule is that "[t]he cause of action for breach of contract ordinarily accrues at the time of *breach,* and the statute begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his right to sue. [Citations.]" (2 Witkin, Cal. Procedure (2d ed. 1970) § 284, p. 1133.) (Italics in original.) Terming this rule harsh, Witkin also discusses the substantial departure from the rule which has been expressed in warranty cases involving sales: "Under the doctrine of *prospective warranty,* if the seller promises that something shall or shall not happen within a future time, the cause of action does not accrue during that time unless and until the harm occurs." (*Id.,* § 294, at p. 1141.) (Italics in original.)

The California decisional law has adopted the prospective warranty approach. "We are satisfied, however, that this is a case which could properly be found to come within the operation of the principle that, if a warranty relates to a future event before which the defect cannot be discovered by the exercise of reasonable diligence, the warranty, though accompanied by a representation as to present condition, is prospective in character and the statute of limitations begins to run as of the time of that event. This principle, while not always stated in identical language,

has been applied in a variety of factual situations. [Citations.]" (*Aced*, *supra*, 55 Cal.2d 573, at pp. 583-584.)

In *Aced*, the general contractor was not barred by the statute of limitations from pursuing its remedy even though its cross-complaint was filed more than four years after the defective tubing had been installed in the radiant heating system. *Aced* construed the implied warranty of the subcontractor to endure for a reasonable length of time after installation, and found the "future event" to be the leaking of the defective tubing, not discovered by the general contractor until several years after the installation was complete; the cause of action was found to have been filed in timely fashion, although more than four years after delivery, but within four years of discovery.

However, this does not resolve the preliminary underlying question in the case at bench of what length of time was reasonable in terms of applicability of the warranty. Obviously there could be no breach, and resultant accrual date from which the four-year statute commenced running, if the reasonable time envisaged by *Aced* for the existence of the warranty had expired more than four years prior to the crane's collapse in 1968, an event which occurred more than eight years after the reconditioning of the crane by the defendant had been concluded.

There has been little discussion in the case law of what factors determine the length of time to be applied to a *prospective* implied warranty of merchantability. It seems reasonable to conclude, however, that the length of time any chattel, whether new or used, can reasonably be expected to last is of necessity determinable only on a case-by-case basis, according to proof. What might be reasonable with respect to tubing installed in cement would not necessarily apply to a gantry crane. The record before us does not tell us what the reasonable life expectancy of the reconditioned crane was; only expert testimony could shed light on this essential factual determination through trial. (See *Balido* v. *Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 641-644 [105 Cal.Rptr. 890] for a discussion of the problem of limitation and causation which arises from passage of time in products liability cases.)

If it is assumed, arguendo, that plaintiff in the case at bench were to introduce evidence that the crane in question, after defendant's reconditioning work, could reasonably have been expected to operate "in good running condition" for more than eight years, the "future event" described in *Aced* would be the crane's collapse in 1968. If the trier of

fact were to resolve the passage-of-time issue favorably to plaintiff, the accrual of its cause of action in warranty occurred March 30, 1968, at which time the four-year statute commenced running; since suit was filed in 1970, it was filed well within the limitation period.

Defendant also contends that, even if the *Aced* principle of prospective warranty is applicable to the instant case, plaintiff is barred from recovery because of its failure to test and inspect the crane prior to selling and delivering it to the city in 1961. The *Aced* principle of prospective warranty seems to apply to a "future event" only if the defect "cannot be discovered by the exercise of reasonable diligence" at some prior time by the person in whose favor the warranty runs.

Defendant seeks to invoke the doctrine of collateral estoppel as support for its assertion that the time for reasonable discovery by plaintiff has already been determined in the *Green-Harris* litigation, and that plaintiff is bound thereby. If defendant is correct, the statute of limitations ran out in 1965, at the latest.

It may be recalled that the *Green-Harris* court found that plaintiff Link-Belt herein had breached a duty owed to the *Green-Harris* plaintiffs by its failure to inspect the crane prior to delivery to the city in 1961, and that the defect was one which plaintiff Link-Belt herein would have discovered had it employed inspection and testing procedures which were part of "the state of the art" during the time period in question.

The doctrine of collateral estoppel was recently discussed in *Chern* in the following terms: "In the present case, however, estoppel is asserted on the basis of representations made by a different defendant in a different transaction than that complained of in the prior suit. While we find no cases on point, the authorities suggest that 'where the subsequent action involves parallel facts, but a different historical transaction, the application of the law to the facts is not subject to collateral estoppel.' [Citations.] In general it may be said that rulings of law, divorced from the specific facts to which they were applied, are not binding under principles of res judicata. [Citations.]" (*Chern, supra,* 15 Cal.3d 866, at pp. 871-872.) It is significant that *Chern* cites, with apparent approval, cases in which collateral estoppel was held inapplicable to subsequent litigation between the same parties: *Commissioner* v. *Sunnen* (1948) 333 U.S. 591, 597-599 [92 L.Ed. 898, 905-907, 68 S.Ct. 715] (collateral estoppel effect denied as to suit for income tax between same parties raising same legal issue but in different years); *Grandview Dairy* v. *Jones*

(2d Cir. 1946) 157 F.2d 5, 10, cert. den., 329 U.S. 787 [91 L.Ed. 675, 67 S.Ct. 355] (question of law redecided by War Foods Administration as to subsequent, identical facts between the same parties).

In my view, the instant case is not one in which the doctrine of collateral estoppel may be invoked. The instant case does not involve the same parties that were involved in the prior *Green-Harris* litigation. Although plaintiff Link-Belt herein was a defendant in the *Green-Harris* litigation, defendant Star herein was not a party to the *Green-Harris* litigation.

In addition, the issues between Link-Belt and Star in the case before us are different from the issues litigated in *Green-Harris*. The crucial issues concerned the duties of inspection owed by Link-Belt to the City of Los Angeles, which bought the crane from Link-Belt, to Green, killed in the accident, and to Harris, injured in the accident, under principles of negligence and strict liability in tort. Here, however, the concern relates to duties and rights between plaintiff Link-Belt and defendant Star arising out of a contract between these two parties for Star to supply labor and materials to recondition the crane. The duty to inspect the crane before delivery by Link-Belt to the city, placed upon Link-Belt by the *Green-Harris* court in favor of decedent Green and the injured Harris, does not lead to the inexorable conclusion that, without presentation of evidence, that same duty to inspect existed between plaintiff Link-Belt and defendant Star—arising out of the contract between these parties—not an issue at all decided in the *Green-Harris* litigation.

It is true that the *statutory* law of warranty in a sales transaction does not govern the law of warranty as applied to products liability cases resulting in injury to the users of the product, or as applied to *nonsales* contracts such as contracts for labor and material. "Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed." (*Greenman, supra,* 59 Cal.2d 57, at p. 63.) In similar vein we find our Supreme Court stating in *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 15 [45 Cal.Rptr. 17, 403 P.2d 145]: "The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions

of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries."

In the case at bench we are dealing with a contract to supply labor and materials to recondition and repair a piece of complicated equipment so that it will be placed in "good running condition." Whether, in such a situation, plaintiff Link-Belt would be expected to rely upon Star's total inspection or whether there would be a duty upon plaintiff to dismantle the crane upon its delivery to plaintiff could well depend on factors such as the intent of the parties and practices and expectations within the industry. These are matters for the trier of fact to determine from the presentation of evidence.

Hence, I reject the defendant's contention that the doctrine of collateral estoppel applies to preclude a trial on the merits. The matters which might affect plaintiff's right of recovery on warranty and which present triable issues of fact include, but are not necessarily limited to, the following: (1) the passage of time; (2) the failure of either party to this lawsuit to inspect; (3) an attempt by plaintiff to change the load capacity of the crane; and (4) a pre-1961 breakdown of the crane which may or may not have had an impact upon the ultimate collapse of the crane.

Link-Belt seeks to have this court reexamine the law of implied indemnity in light of the law of comparative negligence established by *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]. I do not consider that any such reexamination is necessary under the circumstances presented in the case at bench, since it is my view that the active-passive negligence doctrine that is usually applied in indemnification actions is not applicable in the case at bench, and, even if it were applicable, it is not the proper subject of summary judgment under the facts involved here.

Even if the doctrine of implied indemnity were to be considered applicable to an action based on implied warranty to preclude recovery by one whose conduct amounts to active negligence, plaintiff Link-Belt is still entitled to its day in court with defendant Star regarding this issue of active-passive negligence. In this respect, the case of *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97], cited by the majority, is analogous to the instant case. In *Rossmoor,* one workman was injured and one workman was killed by a cave-in of a trench being dug by their employer, Pylon, which had contracted with

plaintiff Rossmoor to install for Rossmoor sewer pipes, which were to be laid in the trenches. The trench in which the one workman was injured and the other killed caved in for lack of shoring. The injured workman and the heirs of the deceased workman brought suit against Rossmoor and recovered a judgment which was paid by Rossmoor's carrier. Rossmoor then sued Pylon to recover the amount of the judgment paid to the injured workman and the heirs of the deceased workman.

Rossmoor's suit against Pylon was based upon express indemnity provisions in the contract between Rossmoor and Pylon. The original lawsuit against Rossmoor brought by the injured workman and the heirs of the deceased workman was entitled *Widman* v. *Rossmoor Sanitation, Inc.* (1971) 19 Cal.App.3d 734 [97 Cal.Rptr. 52]. In the *Widman* case the jury answered a special interrogatory which stated that "Rossmoor Sanitation *was* negligent in proximately causing the accident." (*Widman, supra,* 19 Cal.App.3d 734 at p. 739.) In upholding the judgment in *Widman,* the court concluded that Rossmoor was vicariously liable under section 416 of the Restatement Second of Torts, for Pylon's negligence in failing to shore trench No. 2. But the *Widman* court also held that, entirely independent of the vicarious liability imposed upon Rossmoor, there was substantial evidence that Rossmoor, as owner of the land, retained considerable measure of control over Pylon's activities; that Rossmoor's engineering firm had at least two employees—engineers or inspectors—on the job and that these men were directed to correct any dangerous condition and had the authority to demand that all underground work conformed to safety requirements.

The *Widman* court stated that "[i]t necessarily follows that the jury could also have found that Rossmoor Sanitation retained sufficient control over the premises to bring it within the rule that an owner of land who reserves control of the premises is an *employer* within the meaning of section 6304 of the Labor Code and subject to the duty to provide a safe place of employment [citations], and that having assumed such control, it had the responsibility for the enforcement of the safety order requiring the shoring of trench No. 2. [Citation.]" (*Widman, supra,* 19 Cal.App.3d 734 at p. 748.)

In the subsequent action of Rossmoor against Pylon, the issue of whether Rossmoor was actively negligent so as to preclude recovery on its contract of indemnity with Pylon was litigated, without reference to the jury's finding in the *Widman* lawsuit, and without reference to the basis upon which the *Widman* court sustained the liability of Rossmoor

to the *Widman* plaintiffs. The trial court in Rossmoor's action against Pylon "found that any negligence by Rossmoor in the events that led to the cave-in was merely of a 'passive' nature, i.e., in failing to discover that Pylon employees intended to enter an unshored trench." (*Rossmoor, supra,* 13 Cal.3d 622 at p. 627.) In Rossmoor's action against Pylon, it was argued by defendant Pylon that Rossmoor was actively negligent as a matter of law, but the *Rossmoor* court rejected that contention and upheld the trial judge's determination of passive negligence. The Supreme Court in *Rossmoor* stated: "We believe, however, that the trier of fact could reasonably conclude from all the evidence that at the time of the accident Rossmoor had no supervisory personnel at the site of the accident and had no knowledge that Pylon employees intended to enter the unshored trench; that Pylon alone, through its employees, knew that [the two workmen] intended to enter the unshored trench; and that Pylon was directly responsible for the trench remaining unshored. . . . In view of the factual conflict, it is appropriate to defer to the determination of the trier of fact: that Rossmoor was at most passively negligent." (*Rossmoor, supra,* 13 Cal.3d 622, at pp. 630-631.)

Assuming that Link-Belt in the case at bench would be barred from recovery against Star if Link-Belt was actively negligent, the issue is one that Link-Belt is entitled to litigate on the merits against Star, irrespective of the litigation of such an issue between Link-Belt and the City of Los Angeles in the *Green-Harris* litigation. Link-Belt is entitled to an independent determination of this issue as between it and Star just as Rossmoor was entitled to an independent determination of the issue of active versus passive negligence in Rossmoor's suit against Pylon, even though there had been a contrary determination of the issue as between the *Widman* plaintiffs and Rossmoor in the initial lawsuit brought by the *Widman* plaintiffs.

If the jury's verdict and the appellate court's decision sustaining the *Widman* judgment was not res judicata of the issue in the subsequent action by Rossmoor against Pylon, neither should the determination by the trial judge of the active or passive character of Link-Belt's negligence with regard to the respective liability of the City of Los Angeles and Link-Belt to the *Green-Harris* plaintiffs preclude an independent determination of the issue of Link-Belt's active or passive negligence with respect to Link-Belt's action to recover against Star the loss suffered by Link-Belt in the *Green-Harris* litigation.

I do not interpret the findings of fact and conclusions of law made in the *Green-Harris* litigation to be definitive, conclusive, or binding for

purposes of the law of indemnification in plaintiff Link-Belt's lawsuit against defendant Star. As discussed previously herein, the issue between Link-Belt and Star with respect to active or passive negligence is entirely different and independent of this issue as it was determined by the trial judge in the *Green-Harris* litigation to which defendant Star was not a party. Because of this difference, neither the doctrine of res judicata nor the doctrine of *collateral estoppel* can be applied to preclude Link-Belt from its right to have the issue litigated with Star.

The view set forth in *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* appears to mandate that the active-passive negligence issue be litigated between Link-Belt and Star in a full-scale trial because of the concept that each situation involving application of the active-passive negligence doctrine depends upon an analysis of the particular circumstances involved. Thus, the *Rossmoor* court stated: "In actuality, however, we do not employ the active-passive dichotomy as wholly dispositive of this or any other case. We are ever mindful of the pragmatic approach taken by this court in *Harvey Mach. Co.* v. *Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445 [6 Cal.Rptr. 284, 353 P.2d 924]. There we viewed the issue as whether the indemnity clause in question operated to exculpate Harvey from the consequences of its own alleged breach of duty: 'The question is one of interpretation of contracts. If it can be determined that the parties intended by their agreement to protect the indemnitee against claims of damage by any or even all types of negligent conduct on its part, such an agreement would effectively accomplish that purpose.' (*Id.* at p. 447.) . . . . [¶] Thus, while adhering to the underlying distinction between active and passive negligence which has long been accepted by the bench, the bar, and the insurance industry, we hold that, as declared in *Harvey,* the question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts." (*Rossmoor, supra,* 13 Cal.3d 622, at pp. 632-633.)

I would reverse the judgment from which the appeal has been taken.

A petition for a rehearing was denied January 7, 1977. Jefferson, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied February 17, 1977.